36 F.3d 1097
 74 A.F.T.R.2d 94-6573
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
AMES INVESTMENT, INC., Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 93-1859.
 United States Court of Appeals, Sixth Circuit.
 Sept. 28, 1994.
 
 Before: GUY and BATCHELDER, Circuit Judges; and McCALLA, District Judge.*
 PER CURIAM.
 
 
 1
 This is a wrongful levy action under Internal Revenue Code Sec. 7426 (26 U.S.C. Sec. 7426 (1954)). The plaintiff, Ames Investment, Inc., brought this lawsuit against defendants the United States of America and Internal Revenue Service Officer Michael E. Rogala, alleging that they wrongfully seized Ames's real property to satisfy the debt of one of its shareholders, William Johnson. After a bench trial, the district court entered an order dismissing the case. Finding no merit to the arguments raised on appeal, we affirm.
 
 I.
 
 2
 We summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.
 
 
 3
 Ames is in the business of purchasing and managing rental property. It was incorporated in Detroit, Michigan, on March 25, 1969, and its original officers, directors, and shareholders were William Johnson, the taxpayer whose unpaid tax liability gave rise to the disputed levy; his wife, Barbara; and James Brown, a real estate agent. Ames issued a total of 50 shares of stock: 20 shares to Barbara Johnson, 15 shares to William Johnson, and 15 shares to James Brown. Upon Barbara's death in 1969, her twenty shares were divided equally among the Johnsons' two daughters, Charlotte and Cherie. James Brown subsequently transferred five of his shares to real estate broker Laverne C. Miller, in lieu of a commission when he acted as an agent for Ames's purchase of property. William Johnson also transferred five of his shares to Jesse Lamb for a similar consideration.
 
 
 4
 Two weeks after Ames's formation, Ames purchased the property whose seizure is at issue in this case. The property is a single family residence located at 18410 Marlowe in Detroit. The property was purchased from Seymour and Ruth Wayne for $35,000, and title was conveyed by warranty deed. In addition to the Marlowe residence, Ames owned several other pieces of property located in Detroit.
 
 
 5
 The levy at issue in this case stems from William Johnson's failure to pay income taxes for the years 1982, 1983, and 1984. By 1990, he was indebted to the United States for $93,487.11, plus statutory additions that increased his total liability to $190,356.69. On August 7, 1990, the Internal Revenue Service (IRS) served a federal tax levy on Ames as nominee, transferee, or alter ego of Johnson. On August 17, the IRS issued a notice of seizure to Ames, again as nominee, transferee, or alter ego of Johnson, with respect to the Marlowe property.
 
 
 6
 On August 20, 1990, Ames brought this present action under Sec. 7426,[1] alleging that the levy was wrongful because Johnson had no interest in the Marlowe property and Ames owed no liability to the United States.[2] After the resolution of several pretrial motions, a bench trial was held on March 2, 1993. As will be discussed later, based on evidence that Ames was the alter ego of Johnson and that there was a strong nexus between Johnson and the Marlowe property, the court held that Ames could not support its wrongful levy claim.[3] Thus, on April 21, 1993, the court entered its order dismissing this action. This appeal followed.
 
 II.
 
 7
 Ames raises two arguments on appeal. Ames first contends that the district court's factual findings are clearly erroneous. More specifically, Ames maintains that certain facts found by the court, which were relevant to its determination that Ames is an alter ego of Johnson, are not supported by the evidence. Ames also argues that the district court's application of the law is clearly erroneous. According to Ames, under Michigan law,[4] a finding of fraud or injustice must be made before a corporate veil can be pierced.[5] Because the district court did not articulate such a finding, Ames contends the court's holding is in error.
 
 
 8
 Ames's first argument must be placed in its proper context. It is not enough to state that a few of the court's findings cannot be traced to testimony given at trial; Ames must prove that the court's ultimate conclusion--that an alter ego relationship existed between Johnson and Ames--was in error. Isolated errors of less than this magnitude will be harmless and not cause for reversal. See Rocha v. Great Am. Ins. Co., 850 F.2d 1095, 1098 (6th Cir.1988). Whether Ames is the alter ego of Johnson is essentially a factual question, so it is generally reviewed under the clearly erroneous standard. See, e.g., Wolfe v. United States, 798 F.2d 1241, 1243-44 n. 2 (9th Cir.1986), cert. denied, 482 U.S. 927 (1987); United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 694 (5th Cir.1985), cert. denied, 475 U.S. 1014 (1986); Valley Fin., Inc. v. United States, 629 F.2d 162, 172 (D.C.Cir.1980), cert. denied, 451 U.S. 1018 (1981); DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 684 (4th Cir.1976). But see Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 148 (3rd Cir.1988). Thus, our duty is to determine, by reference to the whole record, whether the district court's finding that Ames is an alter ego of Johnson is clearly erroneous.
 
 
 9
 The Supreme Court of Michigan has observed that " '[i]n determining whether the corporate entity should be disregarded ... each case is sui generis and must be decided in accordance with its own underlying facts.' " Schlossberg v. State Bar Grievance Bd., 388 Mich. 389, 398 n. 7, 200 N.W.2d 219 (1972) (citations omitted). Although there is no litmus test for determining whether a corporation is an alter ego of one its shareholders, courts have identified numerous factors that should be considered and weighed. Such factors include the structure of ownership and control, observance of corporate formalities, presence of asset commingling, use of entity funds for individual purposes, and use of the entity for fraudulent or wrongful purposes. See Century Hotels v. United States, 952 F.2d 107, 110 n. 5 (5th Cir.1992) (enumerating factors); Valley Fin., 629 F.2d at 171-72 (same).
 
 
 10
 Here, in the course of the proceedings, the district court heard from numerous officers of Ames, from Johnson, and from the IRS Agent in charge of the investigation. Based on this evidence, the court concluded that Ames was the alter ego of Johnson and that the Marlowe property was used for Johnson's personal benefit. In a very thorough opinion, the court listed the factors that led to this determination. Rather than restate them all, we will summarize some of those facts, which can be verified in the record, that support the court's conclusion.
 
 
 11
 Johnson testified that although he spent some time at the Marlowe property he never lived there. Johnson admitted, however, that both of his daughters and his sister began living at the Marlowe property in 1970. Laverne Miller testified that Johnson was "in and out of the property a lot" (app. 237), and Johnson acknowledged that he had "stayed" at the Marlowe property "for periods at different times." (App. 271.) Friends of his also stayed at the Marlowe property for as long as three or four months. Johnson listed the Marlowe address as his personal residence on his federal income tax returns for 1983 and 1984 and on a state court probation document in 1977. He regularly paid all utility bills on the property, listed the telephone and electric accounts in his own name, and maintained homeowners' insurance on the property in his own name. According to Revenue Officer Rogala, Johnson "indicated that he did live at the property for a substantial period of time[.]" (App. 318-19.) Given the abundance of evidence suggesting that the Marlowe property was used as a personal residence by Johnson and his family, we cannot say the court erred in finding Johnson had used this property for his personal benefit.
 
 
 12
 The court also found equally unconvincing James Brown's and Laverne Miller's portrayal of the Marlowe property as a "corporate headquarters" and a venue for extensive business entertaining. James Brown described the property as a "gathering spot" in the early days of the corporation, where the Ames founders would get together to discuss possible investments. (App. 201-02.) He admitted, however, that the Marlowe property was not needed or used as a headquarters once Ames purchased another piece of property in about 1973. (App. 208.) Brown further testified that the Marlowe property was "only used ... for occasional[ ] entertainment" (app. 208), such as birthday and holiday parties. (App. 215.) When asked whether the Marlowe property was used to "entertain clients," Johnson replied "[y]eah." (App. 255.) The district court judge then questioned Johnson on Ames's alleged clients, and Johnson admitted that "Ames had no clients[.]" (App. 255.) According to Johnson, these clients were really business people whom they wanted to meet. Once again, given this evidence, we cannot say that the court erred in finding the asserted connection between the Marlowe property and legitimate business interests to be dubious.
 
 
 13
 It is undisputed that Johnson never paid rent at any time during his or his family's occupancy of the Marlowe property. Moreover, the property has never been rented to anyone else, and it is the only property owned by Ames that has never been leased. While Johnson testified that he performed services on the property, there was no evidence indicating the value of these services was equal to the rental value of the property, approximately $600 to $800 a month. Given the unique manner in which the Marlowe property was treated, the district court did not err in concluding that the property was held solely for Johnson's personal use and that his rent-free occupancy of it represented tax-free income.
 
 
 14
 The manner in which Ames was operated is also supportive of the district court's conclusions. According to Johnson, Brown, and Miller, Ames has never paid a salary or issued dividends to any of them. (App. 210, 231, 306.) Ames was formed as a money-making venture, yet the company never sold any of its properties and the district court observed that Ames never produced income in excess of its expenses. Ames maintained no corporate ledgers or books. Ames filed no corporate tax returns until 1992, during the instant litigation, when its accountant prepared returns from 1986 through 1989, using raw data in the form of check stubs and receipts supplied by Johnson. (App. 348.) Based on these facts and many others, we cannot say that the district court erred in finding that Ames held title to the Marlowe property as an alter ego of Johnson.
 
 
 15
 Many of the alleged errors identified by Ames either are insignificant and have no bearing on the court's ultimate determination or are better described as a difference of opinion on how statements and the credibility of witnesses should be judged. We must defer to the district court on issues such as these. Anderson v. Bessemer City, 470 U.S. 564, 574 (1985).
 
 
 16
 Ames also argues that, even if there is enough evidence to warrant a finding that it is an alter ego of Johnson, the district court was still required to find evidence of unjust loss or injury before Ames's corporate veil could be pierced. After reviewing the court's opinion and the record, we believe this contention is also without merit.
 
 
 17
 Under Michigan law, "[w]here [a] corporation is a mere agent or instrumentality of its shareholders or a device to avoid legal obligations, the corporate entity may be ignored." Kline v. Kline, 104 Mich.App. 700, 702, 305 N.W.2d 297 (1981) (citation omitted). The facts of this case, as previously discussed, clearly support the conclusion that Ames was a "mere agent or instrumentality" of Johnson. The district court put it more bluntly, stating that Ames "appears to have been a sham" used by Johnson for his personal benefit. (App. 30.) This statement belies Ames's assertion that the court neglected to consider the "equities" of this case. Since we find no clear error in the district court's determination that Ames is an alter-ego of Johnson, we consequently find no error in the court's holding that Ames corporate veil may be pierced.
 
 
 18
 AFFIRMED.
 
 
 
 *
 Honorable Jon P. McCalla, United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 Section 7426 permits a third party who claims an interest in or lien on property allegedly wrongfully levied upon by the United States to bring an action against the United States in a federal district court
 
 
 [2]
 Ames also claimed that defendant Rogala failed to comply with 26 U.S.C. Sec. 6331(d), which requires a notice of seizure thirty days before a levy is executed. The district court found in favor of Rogala on this claim, from which Ames does not appeal
 
 
 [3]
 In order to prove that a tax levy was wrongful, the person or entity challenging the levy must initially show some interest in the property in order to establish standing. Once this initial showing is made, the IRS must prove by substantial evidence a nexus between the property and the taxpayer. If the IRS meets this burden, then the entity challenging the levy has the ultimate burden of proving the levy was wrongful. See Century Hotels v. United States, 952 F.2d 107, 109 (5th Cir.1992)
 
 
 [4]
 Just as both parties and the district court analyzed the facts of this case under Michigan law, so will we
 
 
 [5]
 Ordinarily, courts are called upon to apply the alter ego doctrine in cases where a party seeks to hold an individual liable for a business entity's debts. Here, the United States is using a "reverse piercing" theory. The United States is attempting to reach the assets of a corporation, Ames, in order to satisfy the tax debt owed by a shareholder, Johnson. Although this is a "reverse piercing" case, the inquiry is still the same: Do the facts of this case justify piercing the corporate veil?