**PORTA–JOHN OF AMERICA, INC., a Michigan corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 96–70379.

United States District Court,
E.D. Michigan,
Southern Division.

March 5, 1998.

---

Douglas MacLean, Bingham Farms, MI, for Plaintiff.

Christine Grant, George P. Eliopoulos, Trial Attorneys, U.S. Dept. of Justice, Washington, DC, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDMUNDS, District Judge.

*Introduction*

■ This is a case for wrongful levy. The United States, being owed $367,713 in back taxes by America West Service Corporation, levied against the assets of Porta John of America. The United States claimed it was entitled to this levy because PJA is an alter ego or nominee of AWSC. This Court agrees. Because the Court adopts most of the proposed findings of fact submitted by the United States, the Court here summarizes, by way of introduction, those facts upon which it places the greatest weight in finding against the plaintiff.

The trial in this matter established that Earl and Joanne Braxton have been in the portable toilet business since the early 1970's. When their business failed, as it did on two separate occasions, they simply continued operations in a slightly different corporate structure. Regardless of their corporate name, however, there were many threads of continuity. Joanne Braxton was primarily responsible for office functions, while Earl Braxton was responsible for field operations. Don White was responsible for technical, financial and accounting matters. The same unique computer software, developed by Mr. White, was used by all three corporations. The physical location and telephone numbers of the offices were the same, as were the people who performed the work. The equipment was the same, as were the majority of the customers and contracts. The financing sources were the same—primarily Drs. Ongena and Prose, who seemed to have no idea which corporation was utilizing their money. Payments on contracts performed by one corporation were received by another corporation, depending on where the Braxtons were best able to shelter the money.

The Braxtons engaged in futile subterfuges to try to create distinct corporate structures. They fabricated an asset purchase by PJA but presented no evidence to substantiate the legitimacy of the transaction. They

named new "shareholders" for PJA, all Braxton relatives, but presented no evidence to substantiate any financial commitment from these shareholders, or even knowledge of shareholder status. They characterized the people doing work for PJA as "independent contractors," except when they needed to characterize them as employees for the Small Business Administration. They misrepresented the source of the portable toilets used in PJA's contracts.

In short, the Braxtons did whatever they could to continue in business without paying their tax obligations to the United States. As set forth more fully in the findings of fact and conclusions of law below, their suit for wrongful levy must fail.

### Findings of Fact

1. In the early 1970's, Earl and Jo Ann Braxton took over a business involving several wooden portable toilets and a truck, and built it into a viable business, using plastic portable toilets. (Stipulation of Facts, para. 14).

2. The company moved to 50575 Ryan Road, Utica, Michigan, where it was incorporated under the name of Porta–John Corporation. It later moved next door to 50633 Ryan Road, Utica, Michigan. (Stipulation of Facts, para. 15).

3. PJC operated primarily as a franchiser, and provided a variety of services to its franchisees. At its height. PJC owned 14000 portable toilets that were serviced by its 86 franchisees. (Stipulation of Facts, para. 16).

4. PJC was in the business of selling, leasing and servicing of portable toilets. (Volume IV, Earl Braxton at pp. 21–22).

5. Although Jo Ann Braxton was the President of PJC, Earl Braxton, who was listed at secretary, ran the day-to-day operations at PJC. (Volume IV, Earl Braxton at p. 22; Ex. 64).

6. Earl Braxton hired Don White to work at PJC. (Stipulation of Facts, para. 17).

7. As controller of PJC and an officer, Don White's responsibilities included accounting work, overseeing operations on a general basis, scheduling, bidding, and customer relations. (Stipulation of Facts, para. 18).

8. Originally, Earl and Jo Ann Braxton were the primary owners of PJC. (Volume V, Don White at p. 53).

9. One of PJC's investors was Dr. Charles Ongena, a doctor of osteopathy. (Volume VI, Dr. Ongena at pp. 5–6). His first investment was a loan of $35,000 to PJC in 1975. (Stipulation of Facts, para. 21).

10. Dr. Ongena's interest in the portable toilet business was secondary to his interest in developing a marketable process to extract a life-saving protein from human urine and purify it so that it may be sold in the United States at a huge cost-savings to patients. (Stipulation of Facts, para. 19).

11. To this end, Enzymes of America was formed for research and development of the protein, and PJC, with its virtually unlimited supply of human urine, became a wholly owned subsidiary of Enzymes of America. (Stipulation of Facts, para. 20).

12. America West Service Corporation was incorporated November 29, 1984 in the State of California under the name Porta–John of Southern California and was a franchisee of PJC. (Ex. 1, pp. 3–4; Stipulation of Facts, para. 22).

13. Although AWSC was a franchisee of PJC, it owned its own toilets, and planned to obtain franchises of its own to service those toilets. (Stipulation of Facts, para. 23).

14. AWSC was in the business of selling, servicing, and leasing portable toilets. (Volume IV, Earl Braxton at p. 34).

15. As initially incorporated in 1984, Edward Biel was the President and sole shareholder of AWSC, and Don White was its Chief Financial Officer. (Ex. 1, p. 4). On March 28, 1987, AWSC filed an application for certificate of authority to transact business in Michigan signed by Don White. (Ex. 18; Stipulation of Facts, para. 25).

16. Jo Ann Braxton was also involved with AWSC from the mid–1980's. In 1985, she canceled an AWSC checking account over which she and Don White had signatory

authority. (Ex. 48; Volume I, Jo Ann Braxton at pp. 64–68).

17. Jo Ann Braxton, Earl Braxton, and Don White all had signatory authority over AWSC's bank accounts. (Exs.11–15).

18. Don White prepared a bid on behalf of AWSC to provide portable toilets on Camp Pendleton Marine Base, one of the largest contracts for portable toilets. (Volume V, Don White at p. 68). Mr. White had full authority to enter into a binding contract on behalf of AWSC. (Volume V, Don White, at p. 69).

19. AWSC was awarded the contract and performance was set to begin in February of 1988. (Volume III, Carol Amano at p. 11–12).

20. AWSC used collapsible portable toilets on the Camp Pendleton Marine Base. (Volume I, Jo Ann Braxton at p. 29).

21. Ed Biel died in 1987. (Volume V, Don White at p. 66).

22. After Mr. Biel died, the purported shareholders of AWSC were Dr. Ongena, Dr. Prose, and Dr. Gross. (Volume V, Don White at p. 22). But neither Dr. Prose nor Dr. Ongena knew that they were shareholders of AWSC. In fact, Dr. Prose and Dr. Ongena thought that they were creditors of AWSC, not shareholders. (Ex. 5A, Promissory Note; Volume II, Dr. Prose at p. 7; Volume VI, Dr. Ongena at pp. 8, 10).

23. Dr. Prose first learned that his loan had purportedly been converted to stock when he contacted the Braxtons in 1989 for information on writing off his loan as a bad investment. (Volume II, Dr. Prose at p. 8–10).

24. Dr. Ongena was adamant that if he was a shareholder of AWSC, he had no more ownership interest as of 1990. (Volume VI, Dr. Ongena at p. 38).

25. Assuming that Dr. Prose and Dr. Ongena were shareholders, officers or directors, their positions were nominal at best because they had nothing to do with the day-to-day affairs of AWSC. Dr. Prose testified that he never fulfilled any responsibilities as a shareholders, officer, or director; that he never functioned as an officer or director; that he never signed any documents; that he never attended formal meetings where business was conducted; that he was never advised of AWSC's day-to-day affairs; and that he had no knowledge of AWSC's financial and legal problems. (Volume II, Dr. Prose at pp. 11–15).

26. Similarly, Dr. Ongena testified that he never purchased stock in AWSC; that the Braxtons ran AWSC; that he wouldn't know what to do even if he tried; that he didn't know if he had check signing authority; that he never signed a check; and that he had nothing to do with AWSC after the end of 1990. (Volume VI, Dr. Ongena at pp. 8–12).

27. In an attempt to go public, Enzymes of America hired an accounting firm. As a result of the accounting firm's changes in PJC's accounting methods, which apparently caused losses on the books, Enzymes of America was unable to go public. (Volume I, Jo Ann Braxton at pp. 50–51).

28. Without the injection of cash from the public offering, Earl Braxton decided that PJC, which had accrued over $4,000,000 in debt, should file for a Chapter 7 bankruptcy liquidation. (Volume V, Don White at p. 56–58; Volume I, Jo Ann Braxton at pp. 50–51; Ex. 64).

29. The bankruptcy petition, which was signed by Jo Ann Braxton as President, listed $56,985 of assets and $4,263,921 of liabilities. (Ex. 64).

30. According to the bankruptcy petition and corresponding schedules, the IRS had garnished over $94,000 in the twelve months preceding the filing of the petition, PJC owed an additional $18,322 to the IRS, and owed over $480,000 to other taxing authorities. (Ex. 64, pp. 6, 11–18).

31. PJC also owed Allegheny International Credit Corporation about $2,000,000 that the Braxtons had personally guaranteed. (Volume I, Jo Ann Braxton at p. 58; Volume IV, Earl Braxton at pp. 22–23).

32. In addition, Deloitte obtained a judgment against the Braxtons for nonpayment of accounting fees. (Volume I, Jo Ann Braxton at pp. 58–61; Ex. 66).

33. Although PJC was in the business of renting and leasing toilets, not one portable toilet (or accounts receivable generated from the rental of those toilets) was listed as an asset of the bankruptcy estate. (Ex. 64, Schedule B). The only asset listed for liquidation and distribution to over $4,000,000 in creditors were a vacant house, some trucks, one franchise fee advance, some office furnishings and tanks for a grand total of $56,985. (Ex. 64, Schedule B).

34. When the bankruptcy petition was filed, PJC had no assets because the Braxtons and Don White had already transferred PJC's assets, i.e., its portable toilets and the accounts receivable generated by the use of those toilets, to AWSC. (Ex. 47; Volume III, Testimony of Bill Beaty). According to Bill Beaty, a franchisee of PJC (Ex. 71), Jo Ann Braxton told Mr. Beaty that PJC's accounts had been levied. (Volume III, Bill Beaty at pp. 74–76). In order for business to continue to operate as usual and to ensure that Mr. Beaty was paid, Jo Ann Braxton told Mr. Beaty that he had to ask PJC's clients to pay AWSC. (Volume III, Bill Beaty at pp. 74–76). In order to get paid, Mr. Beaty arranged that payment for a contract entered into by PJC to provide toilets at the Alabama June Jam be paid to AWSC, not PJC. (Volume III, Bill Beaty at pp. 74–78; Ex. 63).

35. Mr. Beaty testified that at Jo Ann Braxton's direction, he also ensured that a contract entered into between PJC and the Canon–Greater Hartford Open golf tournament was paid to AWSC. (Ex. 72, PJC contract; Volume III, Bill Beaty at pp. 78, 82–83). After PJC provided the services, AWSC billed the Canon–Greater Hartford Open (Ex. 72, AWSC invoice), and then AWSC, not PJC, paid Mr. Beaty a percentage of the account receivable for servicing the toilets although Mr. Beaty was still a franchisee of PJC. (Ex. 72, AWSC contractor ledgers; Volume III, Bill Beaty at pp. 82–84).

36. For years, Bill Beaty serviced the Chattanooga Golf Classic as a franchisee of PJC. As with the Alabama June Jam and the Canon–Greater Hartford Open, the Chattanooga Golf Classic was performed by PJC in 1989, but AWSC billed the Chattanooga Golf Classic, and then AWSC, not PJC, paid Mr. Beaty. (Volume III, Bill Beaty at pp. 85–87).

37. In addition, PJC transferred its Colorado accounts receivable and customers to AWSC, purportedly as of June 30, 1989. The agreement provided for future monthly lease fees to PJC for use of PJC's toilets, extending for 36 months unless AWSC returned the toilets. (Ex. 47). Obviously, AWSC did not return the toilets because none were listed as assets on PJC's bankruptcy schedules, and PJC no longer operated after May of 1990.

38. The Braxtons, as well as third parties, treated AWSC as the mirror image of PJC. (Volume IV, Earl Braxton at p. 9; Volume III, Bill Beaty at p. 87). As the Court of Appeals for the State of California stated in litigation between Bill Beaty and the defendants PJC and AWSC: "Apparently Porta–John is a subsidiary of America West Service Corporation. Both parties treat the entities as interchangeable, and we do as well." (Ex. 75, Opinion at p. 2, n. 1).

39. AWSC took over the functions carried out by the bankrupt PJC, as well as its assets. (Ex. 47). AWSC became a franchisor, and entered into franchise agreements with various individuals, including Daryl Burnett and Bill Beaty. (Ex. 40, Master Service Contract Agreement between AWSC and Daryl Burnett attached to Deposition; Ex. 70, Franchise Agreement between William Beaty and AWSC). AWSC took over contracts held by PJC.

40. As of 1990, Earl Braxton, Jo Ann Braxton and Don White were President, Secretary, and Vice–President, respectively, as well as directors of AWSC. (Ex. 19; Exs. 21–22; Stipulation of Facts, para. 27; Volume IV, Earl Braxton at pp. 31–32).

41. Earl Braxton ran AWSC on a day-to-day basis. (Volume IV, Earl Braxton at p. 34; Volume I, Jo Ann Braxton at pp. 83, 88, 90; Volume V, Don White at p. 67, 80). Jo Ann Braxton handled the office, billing, accounts receivable and telemarketing. (Volume I, Jo Ann Braxton at pp. 88–91).

42. Don White maintained the books and records of AWSC, did the accounting, and prepared bids. (Volume I, Jo Ann Braxton

at pp. 83, 87–88, 90). Don White also prepared the corporate returns, and oversaw the preparation of the employment tax returns. (Stipulation of Facts, para. 30; Volume I, Jo Ann Braxton at p. 92).

43. As of 1990, most of AWSC's books and records were kept at the 50633 Ryan Road office in Utica, Michigan. (Volume I, Jo Ann Braxton at pp. 91–92; Stipulation of Facts, para. 31).

44. AWSC's central administrative offices were located at 50633 Ryan Road, Utica, Michigan, and its toll-free number was (800) 521–6310. (Volume I, Jo Ann Braxton at pp. 79–81). AWSC had several different California addresses, including 1291 Alturas, Fallbrook, California, and 4761 State St., Ontario, California. (Exs. 9, 19; Volume IV, Earl Braxton at p. 33; Volume III, Bill Beaty at pp. 94–95).

45. On June 27, 1991, AWSC dumped pollutants in Fallbrook, California. Consequently, the United States sued AWSC for violations of 22 U.S.C. § 1311. AWSC ultimately entered a guilty plea in May of 1992, and paid a fine. (Ex. 49, 49A; Volume I, Jo Ann Braxton at pp. 95–102).

46. Due to the conviction, the EPA debarred AWSC on a site specific basis. (Volume III, Carol Amano at pp. 16–17). The debarment prevented AWSC from obtaining any more government contracts. (Volume I, Jo Ann Braxton at p. 104).

47. Government contracts were the lifeblood of its business. (Volume I, Jo Ann Braxton at p. 104). Therefore, AWSC was forced to stop operating. (Volume I, Jo Ann Braxton at p. 102–104).

48. Within four months of the spill, AWSC stopped paying its employment taxes to the United States. (Ex. 39).

49. The type of tax, period, assessment date, and assessed balance (including statutory additions) of the unpaid taxes, and filing dates for notices of tax liens are as follows (Ex. 39; Volume VI, Michael Des Rosiers at p. 39, 43–49).

| Type of Tax | Period | Assessment Date | Assessed Balance Plus Statutory Add As of 06/02/97 | Date NFTL's Filed Macomb; UCC |
|---|---|---|---|---|
| 941 | 12/31/91 | 03/23/92 | $19,126.29 | 09/09/92; 09/25/92 |
| 941 | 03/31/92 | 10/05/92 | $39,595.35 | 01/25/93; 01/08/93 |
| 941 | 06/30/92 | 10/05/92 | $44,354.37 | 01/25/93; 01/08/93 |
| 941 | 09/30/92 | 12/28/92 | $21,046.30 | ******; 04/06/93 |
| 941 | 12/31/92 | 03/15/92 | $37,655.39 | 07/29/93; ****** |
| 941 | 03/31/93 | 06/21/93 | $26,424.09 | 09/14/95 |
| 941 | 06/30/93 | 09/20/93 | $23,123.53 | 07/29/93; ****** |
| 941 | 09/30/93 | 11/29/93 | $19,531.43 | 09/14/95 |
| 941 | 12/31/93 | 03/07/94 | $19,685.45 | 09/14/95 |
| 941 | 03/31/94 | 06/27/94 | $15,059.65 | 09/14/95 |
| 941 | 06/30/94 | 09/12/94 | $22,099.99 | 09/14/95 |
| 941 | 09/30/94 | 12/12/94 | $19,580.73 | 09/14/95 |
| 941 | 12/31/94 | 03/20/95 | $12,476.79 | 09/14/95 |
| 940 | 12/31/92 | 03/22/93 | $ 5,997.91 | 09/14/95 |
| 940 | 12/31/93 | 03/28/94 | $ 8,572.10 | 09/14/95 |
| 940 | 12/31/94 | 04/03/94 | $15,847.01 | 09/14/95 |

50. As of January 12, 1998, the unpaid balance of the tax liabilities, including accrued interest and penalties, equaled $367,713. (Volume VI, Michael Des Rosiers at p. 50).

51. Mr. Des Rosiers examined the tax returns of AWSC and PJA. He learned that AWSC steadily ran up payroll liabilities from 1992 to 1994, and that the employment tax liabilities for PJA were small in 1994. As soon as AWSC's payrolls decreased, PJA started accruing large payroll tax liabilities.

AWSC averaged about $10,000 in payroll until 1994, when it stopped operating. In 1995, PJA picked up large payroll where AWSC left off. (Volume VI, Michael Des Rosiers at pp. 54–56).

52. Entities other than PJA and AWSC that were operating out of PJA's and AWSC's Ryan Road, Utica, Michigan, address, have liens filed for unpaid tax liabilities. (Volume VI, Michael Des Rosiers at pp. 62–63).

53. All of the tax liabilities arose while the Braxtons controlled AWSC.

54. Don White was aware of the unpaid employment liabilities as they accrued, but did not pay them because Earl Braxton had made the decision not to pay the United States. (Volume V, Don White at p. 81–84; Volume IV, Earl Braxton at pp. 43–44).

55. In May of 1992, AWSC's contract with Camp Pendleton was terminated. (Volume IV, Earl Braxton at p. 43). In addition, AWSC was debarred from Camp Pendleton for illegally dumping waste on the base. (Volume III, Carol Amano at pp. 16–17).

56. AWSC's toilets on Camp Pendleton were cleaned and collected by BFI, and taken to a specific site on the base. (Volume III, John Lujan at p. 49). All of AWSC's toilets were removed from the base by AWSC. (Volume III, Carol Amano at p. 17).

57. Facing a repossession of all of AWSC's assets, the Braxtons and Don White decided to transfer the corporate assets, and some of its liabilities, to PJA, rather than file for bankruptcy. (Volume V, Don White at pp. 30, 39).

58. As evidenced by the "Assignment of Assets for Debt," on December 1, 1993, AWSC transferred 900 portable toilets to PJA outright, and assigned leasehold interests in another 1,241 to PJA. (Ex. 23).

59. In the same transaction, AWSC transferred all equipment and tanks, all office furnishings, four vehicles owned outright,

and various other leased vehicles. (Ex. 23, p. 2).

60. The assignment purports, as consideration, to extinguish an antecedent debt of $223,000 owed to PJA by AWSC, and to provide for the assumption of leases and a debt to Dr. Ongena.

61. PJA presented no evidence, other than the self-serving testimony of Earl Braxton and Don White, that the purported antecedent debt of $223,000 existed. (Ex. 23, para.3). According to Earl Braxton, the accrued debt consisted of fees for building services, truck building, repair fees, office functions, and telemarketing fees that PJA performed for AWSC. (Volume II, Earl Braxton at pp. 72–73). The administrative functions were calculated based on 8% of gross sales of certain territories that would request it. (Volume II, Earl Braxton at p. 77). But the person who reconciled the figures, Don White, testified that the accrued debt represented loans and the sale of portable toilets, toilet parts, chemicals and some supplies. (Volume V, Don White at p. 26).

62. During the trial, the Court specifically directed Mr. Braxton to produce documentation of the creation and legal basis for the debt and documentary evidence that actual payments were collected or paid. (Volume II, the Court at pp. 78–79). Despite the Court's specific request, Mr. Braxton failed to produce any documentation. (Volume IV, Earl Braxton at pp. 46, 54).

63. Similarly, the Court directed Mr. Braxton to produce documentation for AWSC's debt that PJA purportedly assumed in paragraph 4 of the Assignment of Assets for Debt. (Ex. 23; Volume II, the Court at p. 80). Despite the Court's request, Mr. Braxton also failed to provide documentation of the debt for the leases and the trucks. (Volume IV, Earl Braxton at pp. 46, 54).

64. As additional consideration for the transfer in December of 1993, PJA assumed a note payable to Charles Ongena in the amount of $99,894. (Ex. 23, p. 2). Dr. Ongena testified in his deposition taken in Decem-

ber of 1996, that the note of $99,894 had not been paid, and was still on the books of PJA, accruing interest. (Volume VI, Dr. Ongena at 19–20). But at trial, Dr. Ongena claimed that in September of 1996, three months before his deposition, PJA had paid the note off. (Volume VI, Dr. Ongena at 13). According to Dr. Ongena, a $150,000 check he received from PJA in September of 1996 was in fact a partial repayment of the note. (Volume VI, Dr. Ongena at 13–14).

65. To date, Dr. Ongena has invested close to $600,000 in the various entities related to PJC. (Volume VI, Dr. Ongena at pp. 24–25). Dr. Ongena does not, however, have a summary of the money loaned or invested in the companies over the years. Nor does he have a schedule of loans or repayments. (Volume VI, Dr. Ongena at pp. 34, 36). As he explained to the Court: "[w]hen Earl needed money, he'd call me up, and if I could, I'd do it." (Volume VI, Dr. Ongena at p. 36).

66. After hearing the testimony at trial and viewing the demeanor of the witnesses, the Court finds Dr. Ongena's testimony at trial, which was in conflict with his testimony at his deposition, not credible for the following reasons. Dr. Ongena has been a friend of the Braxtons for years, and has vacationed with the Braxtons for several years. (Volume VI, Dr. Ongena at 6). He loans Earl Braxton money whenever asked (Volume VI, Dr. Ongena at 36), and has financial interests connected with the corporations the Braxtons run (Volume VI, Dr. Ongena at pp. 7, 17; Ex. 17). Therefore, he is aligned with the Braxtons.

67. In addition, Dr. Ongena owns National Management Company, a holding company for urinal parts, trademarks and patents, which does not generate any revenue. (Volume VI, Dr. Ongena at pp. 17–18, 25). Earl and Jo Ann Braxton are the only signatories on the checking accounts of National Management. (Volume VI, Dr. Ongena at p. 18). At Earl Braxton's request, Dr. Ongena will write a check to National Management for Earl Braxton to distribute wherever the money is needed. (Volume VI, Dr. Ongena at p. 18).

68. Recently, Dr. Ongena loaned National Management $150,000. The purpose of the loan was for the Olympics. (Volume VI, Dr. Ongena at p. 35). PJA performed the Olympics contract, and repaid Dr. Ongena $150,000 on September 16, 1996. (Volume VI, Dr. Ongena at pp. 35–36). To date, the only repayment on his investment has been the $150,000 from PJA on September 16, 1996. (Volume VI, Dr. Ongena at pp. 24–25).

69. Dr. Ongena does not, however, have a summary of the money loaned or invested in the companies over the years. Nor does he have a schedule of loans or repayments. (Volume VI, Dr. Ongena at pp. 34, 36). As he explained to the Court in response to a question from the bench: "[w]hen Earl needed money, he'd call me up, and if I could, I'd do it." (Volume VI, Dr. Ongena at p. 36).

70. Given all the circumstances surrounding Dr. Ongena's testimony, the Court finds Dr. Ongena's deposition testimony more credible that PJA has not repaid Dr. Ongena the $99,894 note, plus interest, that it assumed as part of the assignment of assets from AWSC to PJA on December 1, 1993. The entire $150,000 paid to Dr. Ongena on September 15, 1996, was repayment of the $150,000 loan to National Management for the Olympics.

71. AWSC periodically transferred money to PJA, and PJA transferred money to AWSC. (Exs.16, 52, 54). If the transfer was not for a specific purchase, Don White would characterize it as a loan. (Volume VI, Don White at p. 100).

72. Don White did not know whether the purported loans would ever be repaid. (Volume VI, Don White at p. 101). In fact, he did not know if the transfer that he characterized as loans would accrue interest, or whether the purported loans would be repaid by a certain date. (Volume VI, Don White at p. 101).

73. In an attempt to purchase PJC from its bankruptcy estate, Charles Ongena formed a new corporation, Stirpluc, on February 11, 1991. (Volume VI, Dr. Ongena at p. 23; Volume IV, Earl Braxton at pp. 67–68; Exs. 24–25).

74. The name Stirpluc was chosen by Jo Ann Braxton, and is "culprits" spelled backwards. (Volume IV, Earl Braxton at p. 68). The name is apparently a reference to a characterization of the Braxtons by a California state judge in the earlier litigation.

75. Stirpluc was unsuccessful in purchasing PJC from the bankruptcy estate and it was liquidated. (Volume IV, Earl Braxton at p. 68). Stirpluc's name was changed to "Porta–John of America (PJA)." (Ex. 26, Ex. 27).

76. Dr. Ongena had no involvement with PJA. (Volume VI, Dr. Ongena at 22–24). He never ran PJA, he was never a shareholder, and even though he was listed as a corporate officer for several years, he was not even aware that he was an officer or director. (Volume VI, Dr. Ongena at 22–24).

77. In order to obtain the Camp Pendleton contract formerly held by AWSC, PJA represented to the SBA that its shareholders were Dr. Ongena and Dr. Prose. (Ex. 30, Bate-stamp 1086). But, for purposes of a Dun & Bradstreet report, Earl Braxton was listed as the owner. The 1994 Dun & Bradstreet Business Information Report for PJA stated that Earl Braxton was President as of 1993, that the business was started by the officers, that 100% of the capital stock was owned by the officers, that starting capital of $70,000 was derived from savings, and that approximately $200,000 has been invested in the business since it began operations. (Ex. 30C, Bate-stamps 1159, 1163).

78. For purposes of this trial, PJA maintained that the purported shareholders of PJA are Margaret Knoepfley, Deanna Hart, Nancy Kwetcher, and Mildred Magy, all relatives of the Braxtons. (P.Ex. 2; Ex. 28; Stipulation of Facts, para. 33; Volume I, Jo Ann Braxton at pp. 119–121). But PJA's

purported shareholders for trial were originally listed as creditors on the books of Stirpluc. Stirpluc's Cash Receipts Journal for 1991–1992 listed a $28,000 loan from Margaret Knoepfley. (Ex. 51). Similarly, monies purportedly invested by Nancy Kwetcher and Mildred Magy was listed as loans. (Ex. 51).

79. Margaret Knoepfley testified that she is 93, she lives on social security, and has no other income except for a Veterans check. (Volume VI, M. Knoepfley at pp. 115–117). As far as she was aware, she was not a shareholder in any company. (Volume VI, M. Knoepfley at p. 117). She was certain that she was never a shareholder of PJA, and never had an involvement in PJA. (Volume VI, M. Knoepfley at p. 118). As she said when showed a stock certificate purporting to represent her shares of stock in PJA, "I have no stock, I have none now. I don't remember having any." (Volume VI, M. Knoepfley at p. 125).

80. Further, Market Knoepfley has no money to make investments. (Volume VI, M. Knoepfley at p. 118). The last time that Ms. Knoepfley gave Earl Braxton money was $600 when her home was sold over 20 years ago. Ms. Knoepfley has not loaned the Braxtons any money in the last ten years because she hasn't had any money. (Volume VI, M. Knoepfley at p. 119). Deanna Hart, the Braxton's daughter and the only rebuttal witness for PJA, testified that she oversaw Ms. Knoepfley's accounts, but that she had no idea where Ms. Knoepfley would get the money to invest in Stirpluc. (Volume VI, Deanna Hart at pp. 156–157, 160). Ms. Hart's testimony that she attended monthly shareholder meetings with Ms. Knoepfley is not credible.

81. For most of 1990, Earl and Jo Ann Braxton, and Don White were PJA's officers. (Stipulation of Facts, para. 34). PJA's 1992 Michigan Annual Report (reflecting the 1991 year) listed Earl Braxton, Jo Ann Braxton, and Don White, as President, Secretary, and Vice–President, respectively (Ex. 31), and Earl Braxton signed PJA's 1991 corporate

return as President (Ex. 37; Stipulation of Facts, para. 35).

82. Although the corporate minute books and Michigan Annual Reports indicate that Charles Ongena and Barry Gross were the officers until June of 1994 (Ex. 27; Stipulation of Facts, para. 35; Exs. 32–33), the Braxtons and Don White signed a bank signature card on June 16, 1993, indicating that they were the officers of PJA. (Ex. 36; Stipulation of Facts, para. 36). Further, Earl Braxton signed PJA's request for extension of time to file the 1993 return as President. (Ex. 38; Stipulation of Facts, para. 36).

83. The 1995 and 1996 Michigan Annual Reports (for the 1994 and 1995 years) indicate that the Braxtons and Don White were PJA's officers during 1994 and 1995. (Exs. 34–35; Ex. 27, Minutes dated June 3, 1994; Stipulation of Facts, para. 37).

84. PJA's address is 50633 Ryan Road, Utica, Michigan, and the toll-free number is the same as the one used by AWSC. (Ex. 29).

85. PJA is in the business of servicing, renting and selling toilets. (Volume I, Jo Ann Braxton at p. 117; Volume IV, Earl Braxton at pp. 73–74).

86. PJA didn't exist and operate until 1992. (Volume IV, Earl Braxton at pp. 69–71).

87. PJA's books, records and checkbooks were kept at the Ryan Road address. (Volume I, Jo Ann Braxton at p. 117; Stipulation of Facts, para. 38).

88. In addition, Don White developed a unique, computerized billing system for PJC. (Volume V, Don White at p. 47).

89. When PJC stopped operating in 1990, AWSC began to use the unique software billing system. After AWSC stopped operating, PJA started using the same unique software billing system. (Volume V, Don White at p. 78).

90. Don White, Earl Braxton and Jo Ann Braxton had the same responsibilities at PJA that they had at AWSC. (Volume I, Jo Ann Braxton at pp. 88–91, 112–116). Earl Braxton ran the day-to-day operation, Jo Ann Braxton ran the office, and Don White did the accounting. (Volume IV, Earl Braxton at p. 74; Volume I, Jo Ann Braxton at p. 115).

91. Earl Braxton, Jo Ann Braxton, and Don White all had check signing authority over PJA's accounts. (Volume IV, Earl Braxton at p. 74).

92. PJA used some of the same workers as AWSC, Jo Ann Braxton, Earl Braxton, Don White, Jim Oehmke, Daryl and Elizabeth Burnett, Bruce Winters, Al Culp, Kevin Hersey, David Omes, George Myers, Mathew Ferrier, Oscar Gonzalez, Ralph Loquet, John Pinto, Vincent Lujan, Robert Rooks, James Eastridge, and Paul Summers all worked for AWSC and then PJA as either employees or independent contractors. (P. Exs. 8, 9, 19; Exs. 77, 78; Volume IV, Earl Braxton at pp. 62, 66–67). Further, Donald Francis worked for PJC and PJA. (P.Ex. 9; Ex. 64, p. 11; Volume IV, Earl Braxton at p. 67).

93. To counter the fact that PJA used the same workers as AWSC, PJA presented a chart (P.Ex. 9) that purported to prove that AWSC and PJA never had the same employees. According to the chart, PJA had no employees in 1992, one employee in 1993, and two employees in 1994, and none of those employees were the same as AWSC's employees. But, PJA represented to Dun & Bradstreet that it had 26 employees in 1994. (Ex. 30C, Bate-stamped 1159–1163). The Dun & Bradstreet report was included in the SBA certificate of competency file. (Ex. 30). (See also, Volume VI, the Court at pp. 145–146).

94. PJA continued the same contracts that AWSC had. For example, AWSC annually rented and serviced portable toilets for the Alabama June Jam, and PJA performed the Alabama June Jam after AWSC stopped operating. (Ex. 63; Volume IV, Earl Braxton at pp. 41–42). PJA took over AWSC's Camp LeJune contract and completed it. (Ex. 30F, Bate-stamp 1098): "The applicant [PJA] has managed (recently completed a contract awarded to America West Service

Corporation for similar services at Camp Le-June, NC.")

95. PJA pursued, and ultimately obtained the Camp Pendleton contract that AWSC had performed. (Stipulation of Facts, para. 39). The type of work that PJA did for Camp Pendleton was the same as the work AWSC had to do for Camp Pendleton. (Volume III, Carol Amano at 28).

96. Although during discovery the Government subpoenaed AWSC to produce all contracts, AWSC failed to produce any contracts between itself and third parties. The relevance of those contracts to the Government was that the Government may have then ascertained whether PJA continued those same contracts. Although no contracts were produced during discovery, AWSC sought to introduce a half-dozen selected contracts as evidence at the trial, firmly establishing that contracts existed at the time of the discovery subpoena. Because no contracts were produced in discovery, even though plaintiff had possession of contracts, a presumption exists that many of the contracts not produced by AWSC were taken over by PJA when AWSC stopped operating. *See International Union, UAW v. NLRB,* 459 F.2d 1329, 1336 (D.C.Cir.1972).

97. Camp Pendleton rejected PJA's bid. (Volume III, Carol Amano at 25).

98. In an attempt to obtain the contract despite the rejection, PJA pursued a certificate of competency issued by the Small Business Administration, which, if granted, required Camp Pendleton to accept the bid, or appeal the competency determination. (Stipulation of Facts, para. 40).

99. PJA presented two requests for certificates of competency, one to the Chicago Small Business Administration (Ex. 30, Bate-stamp 0929–0938), and the other to Detroit SBA. In both requests, PJA represented that it had adequate financial reserves and an adequate supply of toilets available for use. (Stipulation of Facts, para. 45).

100. PJA claimed that (Stipulation of Facts, para. 46; Ex. 30, Bate-stamp 0930):

Porta–John was formed as a new corporation in Michigan in 1991 and began operating portable toilet operations in Michigan, California and other states in early 1992. In approximately two years (as of June 30, 1994), Porta–John has grown annual revenues to approximately $2,000,000 (projected gross revenue for calendar year 1994), established an asset base of nearly $1,200,000, and has accumulated a new worth of more than $280,000.

101. PJA did not inform SBA that its asset base included over 2000 toilets from AWSC, all of AWSC's equipment and tanks, and AWSC's trucks. (Ex. 30, excerpts).

102. Tom Pavlov of the SBA did an on-site inspection of PJA, and wrote a report concluding that PJA could adequately perform the contract at the bid price. (Stipulation of Facts, para. 47).

103. In reaching his conclusions, Mr. Pavlov wrote (Ex. 30, Bate-stamp 1087; Stipulation of Facts, para. 48):

The owners and key officers/managers of Porta–John of America, Inc. appears [sic] to have an extensive background in performing similar/near identical service on various Government bases. This team, operating under the name of America West Service Corporation, has past experience with the identical services at Camp Pendleton, CA. Also, this "group" is active with various commercial customers (locally and nationwide), In the opinion of this Industrial Specialist, Porta–John of America, Inc., is a reflection of America West Service Corporation. The owners are the same, the product/service is identical, the key officers/management are the same and both companies (along with others) operate from the same address. Mr. Donald E. White and Mr. Earl J. Braxton were managers of America West Service Corporation and are now part of Porta–John of America, Inc.

104. Mr. Pavlov also noted that AWSC's employees would be working for PJA, includ-

ing Daryl Burnett, who satisfactorily performed the identical services at the site managing AWSC. (Ex. 30, Bate-stamp 1088).

105. Although AWSC was currently on the "Lists of Parties Excluded from Federal Procurement of Nonprocurement Programs," the debarment did not affect Mr. Pavlov's recommendation because the officers of AWSC were not debarred. (Ex. 30, Bate-stamp 1087).

106. Based on Mr. Pavlov's recommendation, the SBA recommended the issuance of a certificate of competency. The summary stated that PJA was a legally separate entity, and therefore should not automatically be held responsible for its predecessor's failures. It concluded that PJA was adequately performing other contracts, that the principals have adequate experience and performed satisfactorily for nearly five years on an identical contract, that Daryl Burnett successfully managed that identical contract and was committed to return if the award were given to PJA, and the PJA currently has over 1200 units in stock from which they would very much like to be generating revenue. (Ex. 30, Bate-stamp 0894; P.Ex. 16).

107. The SBA never investigated whether PJA and was the alter ego or nominee of AWSC. (Ex. 30).

108. PJA used AWSC's inventory. AWSC used collapsible toilets at Camp Pendleton (Volume I, Jo Ann Braxton at p. 29). Similarly, PJA brought 600–700 collapsible toilets onto the base, and then converted the collapsible toilets to rigid. (Volume III, Carol Amano at pp. 28–30).

109. Although Jo Ann Braxton testified that newly manufactured toilets were used for PJA's Camp Pendleton contract (Volume I, Jo Ann Braxton at p. 30), both Don White and Earl Braxton admitted that some of AWSC's toilets were used for PJA's Camp Pendleton contract. (Volume V, Don White at pp. 40–41; Volume IV, Earl Braxton at p. 74).

110. Further, John Lujan, who serviced toilets on Camp Pendleton for both AWSC and PJA, testified that PJA did not use any new toilets for the PJA contract, and that the toilets currently at Camp Pendleton were the same as those used by AWSC. (Volume III, John Lujan at Pp. 41, 43–46).

111. As of the date of trial, PJA was successfully performing the Camp Pendleton project. (Volume III, Carol Amano at p. 31).

*Conclusions of Law*

 Section 7426 of the Internal Revenue Code (26 U.S.C.) affords the exclusive remedy for an innocent third party whose property has been levied by the Internal Revenue Service to satisfy another person's tax liability. *Texas Commerce Bank–Ft. Worth v. United States*, 896 F.2d 152, 156 (5th Cir.1990); *United Sand and Gravel Contractors v. United States*, 624 F.2d 733, 739 (5th Cir.1980). IRC § 7426(a) provides in relevant part that:

> [i]f a levy has been made on property * * * any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States.

Thus, plaintiff has the initial burden to show that he had title or some other ownership in the property and that the government made a levy on that property because of a tax assessment against another taxpayer. After such a showing has been made by the taxpayer, the burden then shifts to the government to prove a nexus between the taxpayer and the property levied upon. *Morris v. United States Department of Treasury, I.R.S.*, 813 F.2d 343, 345 (11th Cir.1987); *Ames Investment, Inc. v. United States of America*, 36 F.3d 1097, 1994 WL 529863 (6th Cir.1994). This shifting burden does not relieve the plaintiff from the ultimate burden of proving that the levy was wrongful. *Morris, supra* at 345.

In this case, the United States has more than met its burden of showing by substantial evidence the nexus between the taxpayer (AWSC) and the levied property. And in proving nexus, the government actually disproved plaintiff's claim for wrongful levy by establishing that plaintiff PJA is the nominee or alter ego of taxpayer AWSC.

■ Under federal tax law, the Internal Revenue Service may collect the tax debts of a taxpayer from the assets of his nominee, instrumentality, or alter ego. *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350–51, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977); *Lemaster v. United States,* 891 F.2d 115, 119 (6th Cir.1989).

■ When an alter ego relationship is established between a Plaintiff corporation and a taxpayer, the corporate entity may be disregarded for debt liability purposes. According to Michigan state law, "[w]here [a] corporation is a mere agent or instrumentality of its shareholders or a device to avoid legal obligations, the corporate entity may be ignored." *Kline v. Kline,* 104 Mich.App. 700, 702, 305 N.W.2d 297 (1981), *citing People ex rel. Potter v. Michigan Bell Telephone Co.,* 246 Mich. 198, 205, 224 N.W. 438 (1929). Moreover, this Court's analysis of whether the corporate form should be disregarded is especially fact-driven, as "[e]ach case involving disregard of the corporate entity rests on its own special facts." *Kline, supra* 104 Mich.App. at 703, 305 N.W.2d 297, *citing Brown Bros. Equipment Co. v. State Highway Comm.,* 51 Mich.App. 448, 452, 215 N.W.2d 591 (1974); *see also Soloman v. Western Hills Development Company* (After Remand), 110 Mich.App. 257, 263, 312 N.W.2d 428 (1981).

The Sixth Circuit in *Laborers' Pension Trust v. Weinberger Homes, Inc.,* 872 F.2d 702, 704–705 (6th Cir.1988) articulated some of the factors considered in disregarding the corporate form including: (1) the amount of respect given to the separate entity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity; and (3) the fraudulent intent of the incorporators. [ ]. Factors to be considered include undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham. *Id.* at 704–705.

Moreover, adopting Michigan state law interpretation, the Sixth Circuit elaborated on the above factors in *Bodenhamer Building Corp., v. Architectural Research Corp.,* 873 F.2d 109, 112 (6th Cir.1989), which provides that the corporate veil may be pierced when: (a) a corporation and shareholders have complete identity of interests; (b) the corporation is a mere instrumentality of the shareholders; (c) the corporation is a device to avoid a legal obligation; or (d) the corporation is used to defeat public convenience, justify a wrong, protect fraud or defend a crime. *Id.* at 112, *citing Kline v. Kline,* 104 Mich.App. 700, 702–703, 305 N.W.2d 297 (1981); *Williams v. American Title Co.,* 83 Mich.App. 686, 697–699, 269 N.W.2d 481 (1978).

The above factors are not exhaustive, but rather are considerations which a court must take into account in assessing whether a corporate entity may be disregarded for debt liability. *See Bodenhamer Building Corp., v. Architectural Research Corp.,* 873 F.2d 109, 111 (6th Cir.1989), *quoting Klager v. Robert Meyer Co.,* 415 Mich. 402, 411–412, 329 N.W.2d 721, 725 (1982). Ultimately, "[e]ach case must be decided on its own facts." *Bodenhamer, supra* at 111–12, *citing Lettinga v. Agristor Credit Corp.,* 686 F.2d 442, 446 (6th Cir.1982).

In the case at bar, the evidence is overwhelming that PJA is merely the alter ego or nominee of AWSC. PJA and AWSC, while nominally owned by others, were completely controlled by Earl and Jo Ann Braxton, and Don White, who were in fact the officers and directors of both corporations. The busi-

nesses of PJA and AWSC were the same, Don White controlled the accounting and corporate books for both corporations, Earl Braxton ran both companies, and Jo Ann Braxton oversaw the office operations of both companies. Some of the same employees worked for PJA and AWSC, PJA and AWSC used the same address, the same trade name, the same corporate headquarters, and the same phone number. AWSC and PJA commingled funds by transferring monies back and forth, and after the fact characterizing the transfers as loans.

■ In order to establish that property is held by a nominee, the Court must consider six factors: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property. *Libutti v. United States*, 968 F.Supp. 71, 76 (N.D.N.Y. 1997); *Towe Antique Ford Foundation v. IRS*, 791 F.Supp. 1450, 1454 (D.Mont.1992), *aff'd*, 999 F.2d 1387 (9th Cir.1993). *See also LiButti v. United States*, 107 F.3d 110, 119–120 (2d Cir.1997).

The Court finds that PJA obtained AWSC's assets for less than adequate consideration because neither AWSC nor PJA provided any documentary evidence of payment on the toilet and truck leases, or the basis for AWSC's accrued debt, despite several specific requests from the Court; that the Braxtons transferred AWSC's assets to PJA to avoid filing for bankruptcy and thereafter controlled PJA; that the corporate officers, directors, location, type of business, clients, and phone numbers of PJA, to name a few of the close relationships, were the same as AWSC; that the Braxtons and Don White still have possession and control of AWSC's

assets, now held nominally by PJA, and still reap the benefits of AWSC's assets by collecting its profits. Consequently, PJA is also the nominee of AWSC.

*Conclusion*

For the foregoing reasons, the Court finds that PJA is the alter ego or nominee of AWSC and may collect the assets of PJA to satisfy the tax liabilities of AWSC. Having found that PJA is the alter ego or nominee of AWSC, the Court need not analyze the government's right to recover under its alternative theories of fraudulent conveyance, tortious conversion, or transferee liability. It should be noted, however, that the government appears to have a strong and prevailing position on each of those theories as well.