### In re TWO SPRINGS MEMBERSHIP CLUB, Debtor.

**Elaine B. Greaves, Trustee, Plaintiff,**

**v.**

**Office of the Delaware Attorney General, et al., Defendants.**

**Bankruptcy No. 04–44837.
Adversary No. 06–4112.**

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

April 9, 2009.

Andrew W. Suhar, Suhar & Macejko, LLC, Youngstown, OH, for Plaintiff.

Douglas Snoeyenbos, U.S. Justice Dept, Washington, D.C., Martha E. Romero, Whittier, CA, for Defendant.

## MEMORANDUM OPINION REGARDING TRIAL

KAY WOODS, Bankruptcy Judge.

Debtor Two Springs Membership Club ("Debtor") filed a voluntary petition pursuant to chapter 11 of Title 11 on October 4, 2004, which was converted to a case under chapter 7 on June 30, 2005. Elaine Greaves ("Trustee") was appointed chapter 7 trustee in Debtor's case.

Debtor's assets consisted of: (i) certain real estate at 14200 Indian Avenue, North Palm Springs, California, upon which a campground for recreational vehicles was operated ("Campground") and (ii) certain personal property located thereat. On September 6, 2006, Trustee filed Motion to Sell Property by Private Sale Free and Clear of All Liens, Encumbrances and Other Interests ("Motion to Sell") (Main Case Doc. # 64), which sought authority to

sell the Campground. Michael D. Buzulencia ("Revcon Trustee"), chapter 7 trustee for Revcon Motorcoach, Inc., a Nevada corporation ("Revcon Nevada"), Case No. 04–44836,[1] filed Limited Objection to Sale (Main Case Doc. # 70) on September 21, 2005. The Limited Objection asserted that the Campground might be an asset of Revcon Nevada because the Revcon Trustee understood that Revcon Nevada "fraudulently transferred the real estate it owns to [Debtor] which is being sold by [Debtor's] trustee[.]"

On October 24, 2005, this Court entered Order Authorizing Sale of Property Free and Clear of All Liens, Encumbrances, Claims and Other Interests ("Sale Order") (Main Case Doc. # 75), which authorized the sale of the Campground. Trustee sold the Campground for $2,610,000.00 ("Sale Proceeds") from which she was authorized to: (i) pay closing costs; (ii) pay accrued and delinquent real estate taxes; (iii) pay the balance of the mortgage, not to exceed $1,300,000.00; (iv) hold in escrow $33,000.00 to resolve the Revcon Trustee's Limited Objection; and (v) pay estimated administrative tax expenses in the aggregate amount of $500,000.00. All other liens, claims and encumbrances attached to the Sales Proceeds in the order of their priority and with the same validity and effect that they had against the Campground. The Sale Order also directed Trustee to commence an adversary proceeding to determine the extent of all liens, claims and encumbrances against the Campground.

On June 1, 2006, Trustee commenced the instant adversary proceeding, seeking a determination of the validity, priority and extent of all liens against the Campground. Twenty defendants were named and served in the Adversary Proceeding. On June 27, 2006, the United States of America, on behalf of the Internal Revenue Service ("Government"), filed United States' Answer ("Government Answer") (Adv. Proc. Doc. # 8). On July 20, 2006, Camp Coast to Coast, Inc. and the Affinity Group, Inc. (collectively, "Coast") filed Answer, Counterclaim and Crossclaim of Camp Coast to Coast, Inc. and Affinity Group, Inc. ("Coast Answer") (Adv. Proc. Doc. # 15). On April 2, 2008, the County of Riverside and County of Riverside Treasurer (not a separate entity), California ("Riverside County") filed Answer to Complaint to Determine Validity, Priority and Extent of Liens and Determination of Income [sic] Liability by Secured Creditor County of Riverside and Riverside County Treasurer, California (Adv. Proc. Doc. # 52). Riverside County filed Motion to Deem Answer to Plaintiff's Complaint Timely Filed Filed [sic] by Secured Creditor County of Riverside and Riverside County Treasurer, California (Unopposed by Trustee) (Adv. Proc. Doc. # 124) on November 14, 2008. The Court entered Order on Motion to Deem Answer to Plaintiff's Complaint Timely Filed by Secured Creditor County of Riverside and Riverside County Treasurer, California (Adv. Proc. Doc. # 139) on December 3, 2008. All other defendants failed to answer or otherwise respond to the Complaint. Trustee obtained default judgments against all other defendants, with the exception of Revcon Nevada.[2]

---

1. Revcon Nevada filed a chapter 11 bankruptcy case in this court on October 4, 2004—the same day Debtor filed its bankruptcy case. The Revcon Nevada case was also converted to chapter 7 on June 30, 2005. Debtor and Revcon Nevada were represented by the same counsel and were both part of the Novelli Group, as defined *infra*.

2. As set forth above, Revcon Nevada was also a debtor in this Bankruptcy Court. As a consequence, this Adversary Proceeding was

On October 6, 2006, the Court entered Order (Main Case Doc. # 92), which provided for "full settlement of [the Revcon Trustee's] claim to the [S]ale [P]roceeds" in consideration of payment by Trustee of $33,000.00.[3] (Order at 2.)

Trustee settled the claim of Riverside County, and the Court entered Judgment Order With Regard to Riverside County, California/Riverside County Treasurer ("Judgment Order") (Adv. Proc. Doc. # 118) on November 7, 2008. The Judgment Order provided that: (i) real estate taxes on the Campground owing by Debtor to Riverside County are the first and best lien on the Sale Proceeds; (ii) the undisputed amount of such real estate taxes is $303,191.70 ("Tax Amount"); (iii) Trustee will immediately pay Riverside the Tax Amount; and (iv) Trustee will retain $13,291.21 in a separate account until further order of the Court.[4]

After settling with the Revcon Trustee and Riverside County, the only defendants remaining in this Adversary Proceeding are the Government and Coast. Coast asserted a counterclaim against Trustee, alleging that, on October 15, 2001, it had filed a judgment lien with the Superior Court of Orange County, California, against Revcon Nevada, dba Debtor, in the amount of $3,880,038.54 ("Judgment Lien") and that such Judgment Lien is a "valid and subsisting lien" upon the Sale Proceeds. (Coast Answer ¶ 12.) Coast also asserted a crossclaim against Revcon Nevada,[5] arguing that Debtor and Revcon Nevada "conducted operations in such a fashion that they disregarded the valid business interest of the other in making decisions with respect to each of the entities[,]" and, thus, "each debtors' [sic] assets and each debtors' [sic] liabilities . . . [are] the assets and liabilities of the other." (*Id.* ¶¶ 18–19.) The Government asserted "its interest in the [Sale P]roceeds based on federal tax liens associated with unpaid federal tax assessments originally made in the names of All Seasons Resorts, Inc., Travel America, Inc., Revcon Motorcoach, Inc. and Two Springs Membership Club, as set forth in the United States proof of claim, filed . . . on January 11, 2005." (Gov't Answer ¶ 6.)

Coast and the Government each insist that it has the first and best lien against the Sale Proceeds (after the Tax Amount)[6] Neither Coast nor the Government has a direct lien against Debtor's interest in the Campground. Both parties rely on the theory of alter ego in order to assert the priority of their liens.

stayed against Revcon Nevada, pursuant to 11 U.S.C. § 362.

3. As set forth above, the Revcon Trustee asserted that Revcon Nevada fraudulently transferred the Campground to Debtor. The Revcon Trustee never (i) filed an action to avoid the transfer, and/or (ii) sought to bring either the Campground or the entire Sale Proceeds into the Revcon Nevada bankruptcy estate. However, on August 23, 2005, the Revcon Trustee filed a proof of claim in Debtor's case, asserting an unsecured claim in an unknown amount based on "transfer of assets to debtor." The Revcon Trustee settled all claims relating to the allegedly fraudulent transfer for $33,000.00. Despite Coast's contention that the Revcon Trustee has abandoned any and all causes of action related to the alleged fraudulent conveyance of the Campground, this Court finds that, having settled such claims, the Revcon Trustee administered— rather than abandoned—them.

4. The Government appealed (i) the Judgment Order; and (ii) this Court's Order Denying Motion to Amend Answer and Assert Crossclaim (Adv. Proc. Doc. # 120) entered on November 12, 2008, which denied United States Motion for Leave to Amend Answer and Assert Crossclaim (Adv. Proc. Doc. # 113) filed October 9, 2008.

5. See note 2, *supra.*

6. See note 4, *supra.*

Prior to trial, the Court ruled on cross motions for summary judgment filed by the Government and Coast and a second motion for summary judgment filed by the Government.

The Court scheduled trial to begin on February 23, 2009, at which the only testimony presented by the parties were jointly designated portions of deposition transcripts of Raymond Novelli, dated October 10, 2007, and Marlies Novelli, dated September 5, 2007.[7] The following documents were admitted as exhibits: Exhibits 1–3, 6–10, 16, 17, 19, 20, 25–28, 30, 31, 40, 41, 43, 44, 50–55, 59–61, 65 (but only to the extent the deposition of Marlies Novelli contained testimony about each memorandum contained in Exhibit 65), 67, and 75–78. The Court sustained Coast's objection to the admission of Exhibits 5, 45, 46, 56, 62, 71–73, 79, and 80. Exhibit 64 was withdrawn by the Government. The parties identified the following issues to be determined at trial:

1. Are Revcon Nevada and Debtor alter egos of each other? If so, is Coast's judgment against Revcon Nevada a lien against the Sale Proceeds? If so, when did the lien arise?

2. Are Revcon Nevada and one or more of (i) Travel America,[8] (ii) Revcon California, and/or (iii) All Seasons, as well as Revcon Nevada and Debtor, alter egos of each other?[9] If so, are the tax liens asserted by the Government against such entities liens against the Sale Proceeds?

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and the general order of reference (General Order No. 84) entered

7. Despite the Court's repeated express preference for the parties to read the designated portions of the deposition testimony into the record, neither party was prepared to do so. Counsel for the Government handed the Court unmarked copies of the deposition transcripts and a separate document containing the parties' designation and counter-designation of the transcript. The parties' failure and refusal to read the deposition transcripts into the record created confusion and difficulty when the Government moved for admission of exhibits because the Court could not determine whether any exhibit had been referred to or identified by either Raymond or Marlies Novelli during their depositions.

8. The Government stated at trial, and again in United States' Proposed Findings of Fact (Adv. Proc. Doc. # 164) filed March 23, 2009, that this Court previously ruled that Revcon Nevada and Travel America are alter egos of each other. (See Trial Tr. at 31 and Proposed Findings of Fact at 15, n. 8.) This is simply not the case. As the Court informed the Government at trial, "I want to be very clear in the holding and the ruling I made about judicial estoppel. I did not hold or find that Travel America and Revcon Nevada are alter egos. All I said is that to the extent the IRS puts forth a prima facie case that alter ego would be applicable between those two entities, that Coast is estopped from arguing otherwise. But you just said that I had already made that decision. I have not. And I want to make sure that we're very clear. I have made no ruling with respect to any of the entities being alter egos of each other." (Trial Tr. 31:19–32:5.) See also, Memorandum Opinion Granting, in Part, and Denying, in Part, the United States' Motion for Summary Judgment Based on Judicial Estoppel (Adv. Proc. Doc. # 156) at 8–10, 12.

9. The deposition testimony jointly submitted by the Government and Coast does not address the direct relationship, if any, between Debtor and either All Seasons, Travel America or Revcon California, although there is testimony concerning Revcon Nevada's relationship with each of these entities. If this Court finds that Debtor and Revcon Nevada are alter egos, a finding that Revcon Nevada is the alter ego of (i) All Seasons, (ii) Travel America, and/or (iii) Revcon California would also make any such alter ego entity the alter ego of Debtor. However, if Debtor and Revcon Nevada are not alter egos of each other, there is no independent basis to find alter ego status between Debtor and All Seasons, Travel America and/or Revcon California.

in this district pursuant to 28 U.S.C. § 157(a). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O). The following constitutes the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR.P. 7052.

## I. FACTUAL AND PROCEDURAL BACKGROUND [10]

Debtor is one of several campgrounds owned and/or operated by Raymond Novelli ("Novelli") and various associates (collectively, "Novelli Group"). Debtor filed a chapter 11 voluntary petition in this Court on October 4, 2004 (Case No. 04–44837) ("Debtor's Case"). Revcon Nevada, another Novelli Group entity, also filed a chapter 11 voluntary petition in this Court on October 4, 2004 (Case No. 04–44836) ("Revcon Nevada Case"). Each of these cases was converted to chapter 7 on June 30, 2005.

Debtor did not list Coast as a creditor in its voluntary petition. Revcon Nevada listed Coast as its largest creditor, with an unsecured claim of $3,880,038.54.[11] The Court entered Notices of Need to File Proof of Claim Due to Recovery of Assets in (i) Debtor's Case, and (ii) the Revcon Nevada Case, setting the last date to file claims in each case. The claims deadline for the Revcon Nevada Case was December 28, 2005 (Revcon Nevada Case Doc. # 43). The claims deadline for Debtor's Case was November 9, 2005 (Debtor's Case Doc. # 61). Coast filed claims for $3,880,038.54 in (i) the Revcon Nevada Case (Revcon Nevada Case Claim No. 3) on April 17, 2007, and (ii) Debtor's Case (Debtor's Case Claim No. 10) on April 18, 2007. The Revcon Trustee filed Trustee's Final Report on January 17, 2008 (Revcon Nevada Case Doc. # 57), in which he noted that no distribution was made on Coast's Claim No. 3 because it had been filed late.

As set forth above, Debtor's bankruptcy estate included the Campground, which was sold pursuant to the Sale Order. Distribution of the balance of the Sale Proceeds will be determined by this Opinion.

### A. Coast Claim

The following facts are relevant to Coast's claim. Revcon Nevada purchased the Campground from Miles Shook on March 5, 1993, and recorded the grant deed on May 19, 1993. Revcon Nevada paid for the Campground with a $1,080,000.00 promissory note secured by a deed of trust for the Campground.

Revcon Nevada and certain other Novelli Group entities, which included Travel America, filed suit against Coast and other defendants ("California Case") in the Superior Court of the State of California in and for the County of Orange ("California Court") on January 28, 1998. The California Court ruled in favor of all defendants on October 10, 2000. Coast obtained a joint and several judgment against Revcon Nevada, Travel America, and the other California Case plaintiffs for $3,880,038.54 ("Judgment") on February 14, 2001.

---

10. The facts set forth herein are taken from (i) Stipulation on Documents and Facts ("Stipulation") (Doc. # 42), jointly filed by Coast and the Government on January 14, 2008; (ii) United States' Proposed Findings of Fact (Doc. # 164), filed by the Government on March 23, 2009; (iii) Proposed Findings of Fact Submitted by Camp Coast to Coast, Inc. and Affinity Group, Inc. (Doc. # 163), filed by

Coast on March 23, 2009; (iv) the admitted trial exhibits; and/or (v) prior orders of the Court.

11. Revcon Nevada listed Coast as having a disputed claim, which required Coast to file a *proof of claim prior to the bar date* in order to be entitled to a distribution from the Revcon Nevada bankruptcy estate.

Because Debtor was incorporated in Delaware on March 28, 2001—subsequent to entry of the Judgment—it was not a party to the California Case. Revcon Nevada transferred the Campground to Debtor for no consideration on April 21, 2001. Debtor recorded a grant deed for the Campground on April 25, 2001. Thereafter, on October 15, 2001, Coast filed an abstract of the Judgment. Coast took no action to collect on the Judgment prior to filing Claim No. 3 in the Revcon Nevada Case on April 17, 2007.

### B. Government Claim

The following facts are relevant to the Government's claims. The Government filed notices of federal tax liens associated with unpaid assessments against All Seasons, Travel America, Revcon Nevada, and Revcon California on January 11, 2005. The amounts of and the dates for which the tax assessments were made are set forth in Claim No. 2 filed by the Government in Debtor's Case. The unpaid tax assessments as of the Petition Date of October 4, 2004, were as follows: [12] All Seasons—$11,876,478.57; Travel America—$1,460,163.07; Revcon Nevada—$59,828.00; and Revcon California—$269,527.79. The Government asserts that, by operation of law, the federal tax liens attached to all property owned by each of the assessed taxpayers on the dates the tax liens were filed, as well as all after acquired property. Because the Govern-

ment asserts that Debtor is the alter ego of All Seasons, Travel America, Revcon Nevada, and Revcon California,[13] it asserts that Debtor is liable for the taxes assessed against each of the other entities and, furthermore, that the federal tax liens are the first and best liens against the Sale Proceeds.

### II. CHOICE OF LAW—ALTER EGO

Coast and the Government each rely on the concept of alter ego as the basis for asserting a prior lien on the Sale Proceeds. Although the parties each argue for imposition of alter ego, they do not agree on (i) which entities should be considered alter egos, or (ii) the appropriate law to use to determine if alter ego exists. The Government urges this Court to apply "federal common law," although it also argues that all of the Novelli Group corporations are alter egos of each other notwithstanding the application of federal law or state law. Coast, on the other hand, urges the Court to look to Delaware law, which is the law of the state of incorporation for Debtor.[14]

### A. Government's Argument for Application of Federal Common Law

The Government argues that this Court should apply federal common law to determine if certain of the Novelli Group entities are alter egos. The Government directs this Court to *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)[15] in support of

---

12. The Government acknowledges that, subsequent to filing Claim No. 2, Debtor's unpaid tax assessment of $4,977.82 has been satisfied and paid. (Gov't Mot. for Summ. J. at 2, n. 2.)

13. See note 9, *supra*.

14. Coast filed Designation of Issues (Adv. Proc. Doc. # 43) on January 25, 2008, in which it stated: "Does Federal Common Law, California law, Ohio law or Nevada law govern the determination of whether or not debt-

or is the alter ego of either All Seasons [sic], Inc. Travel America, Inc., Revcon of California, Revcon of Nevada?" At trial, however, Coast argued that Delaware law—a state not even mentioned in the Designation of Issues—controls this determination. The Government's position at trial remained that federal law is controlling on the issue of alter ego.

15. *Kimbell Foods* articulates the following three part test to determine whether a court should apply uniform common law as a rule to fill a gap in a federal statute: (i) whether

its argument for imposition of a uniform federal common law for federal tax collection purposes.[16] The Government made this same argument before the United States District Court, Middle District of Florida, in *Old W. Annuity & Life Ins. Co. v. Apollo Group*, 2008 WL 2993958, 2008 U.S. Dist. LEXIS 59112 (M.D.Fla. Aug. 1, 2008) wherein the Government and Coast were parties. In the Florida case, the Government argued that certain other Novelli Group entities were alter egos for imposition of tax liens. The Florida court rejected the Government's argument.

The United States contends that federal common law should apply because the determination of alter ego status in this case implicates the rights of the United States arising under a nationwide federal program. In particular, the United States argues that there is a compelling need for a national uniform body of law to apply in deciding alter ego status for federal tax collection purposes so that taxpayers cannot avoid their tax liabilities by taking refuge in a state with particularly restrictive laws regarding the imposition of alter ego status. The United States's argument, however, ignores the fact that several courts ... have held that federal taxes are not considered to be a nationwide federal program such that *Kimbell*

would apply. Moreover, the Supreme Court's decision in *Aquilino v. United States*, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365, 1960–2 C.B. 477 (1960) resolved this issue when it held that "state law controls in determining the nature of the legal interest which the taxpayer had in the property," and federal law "determines the priority of competing liens asserted against the taxpayer's 'property'." 363 U.S. at 513–14 [80 S.Ct. 1285].... The entire dispute rests on whether the United States has a lien on the Clermont property for All Seasons' tax obligations, which can only exist if Apollo is found to be the alter ego of All Seasons.... The Court agrees with Coast that such an analysis implicates the nature of Apollo's and All Seasons' legal interests in the Clermont property, and therefore state law applies.

*Id.*, 2008 WL 2993958 at *7, n. 13, 2008 U.S. Dist. LEXIS 59112 at *27–28, n. 13. (internal citations omitted). Although not bound by the decision of the Florida District Court, this Court is persuaded by the analysis therein, which rejected the Government's argument for application of federal common law in a very similar context.[17]

■ To the extent the Government's tax lien depends upon a finding of alter ego, it

---

there is a need for a nationally uniform body of law to apply in situations like the one presented; (ii) whether application of state law would frustrate important federal policy; and (iii) the impact that the application of federal common law might have on existing relationships under state law. Despite urging a "uniform" federal common law, the Government fails to set forth any one test for determining alter ego under federal law. Instead, the Government lists a variety of different factors in various combinations.

**16.** Despite the Government's representation of the IRS in the instant case, this Adversary Proceeding is not a federal tax collection

case. This is a bankruptcy case in which one of the creditors is the IRS. The purpose of the Bankruptcy Code is to provide equitable distribution of assets to creditors based upon the priority of their claims under 11 U.S.C. § 507 and applicable non-bankruptcy law that determines property rights and interests. The purpose of this Adversary Proceeding is to determine the validity, extent, and priority of liens against the Campground—not to collect federal taxes.

**17.** The Court is aware that *Old W. Annuity & Life Ins. Co. v. Apollo Group* is currently on appeal to the Eleventh Circuit Court of Appeals (Appellate Court Case No. 09–10994–H).

is for the purpose of establishing a property right. The seminal case regarding determination of property rights in bankruptcy is *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The Supreme Court concluded "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Id.* at 54, 99 S.Ct. 914. Although *Butner* dealt with the issue of rents and profits from property, as opposed to the issue of determining alter ego, the *Butner* rationale is applicable here because the underlying issue in both cases is a determination of a creditor's property rights. The Government has a property right and an enforceable lien against the Sale Proceeds only if Debtor is found to be the alter ego of one of the other entities upon which federal tax liens have been assessed.

The Government has presented no compelling reason for this Court to conclude that any of the factors in *Kimbell Foods* requires application of federal common law on the issue of alter ego. The issue presently before this Court deals with property rights that should be left to the determination of state law. In the instant case, this Court has to decide the validity and priority of liens asserted against an asset of Debtor's bankruptcy estate. In order to determine the validity and priority of these competing liens, this Court must decide the property interest(s), if any, the Government and/or Coast have in the Campground. Since both the Government and Coast rely on the theory of alter ego to establish their property rights, this Court is persuaded that *Butner* compels application of state law to determine whether Debtor is the alter ego of any of the entities cited by Coast or the Government.

## B. Coast's Argument for Application of Delaware Law

Coast argues that this Court should utilize Delaware law to determine if Debtor and Revcon Nevada are alter egos of each other.[18] The Campground is located in California, which is a state where neither of its owners—Debtor nor Revcon Nevada—were incorporated. Debtor was incorporated under the laws of the state of Delaware, whereas Revcon Nevada is a Nevada corporation. Because Debtor was incorporated in Delaware, this Court first looks to Delaware law.

■ Delaware permits the corporate veil to be pierced[19] when circumstances so require in the interest of justice.

> There is, of course, no doubt that upon a proper showing corporate entities as between parent and subsidiary may be disregarded and the ultimate party in interest, the parent, be regarded in law and fact as the sole party in a particular transaction. This, however, may not be done in all cases. It may be done only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved.

*Pauley Petroleum v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del.1968).

■ Neither party has presented the Court with any information concerning the law of Nevada regarding alter ego. How-

---

18. Coast is concerned only with establishing Debtor and Revcon Nevada as alter egos. Coast does not state what law should be utilized in considering the alter ego arguments made by the Government concerning the other Novelli Group entities.

19. Piercing the corporate veil and finding alter ego status require proof of virtually the same elements.

ever, this Court has determined that Nevada, like Delaware, requires fraud or injustice in order to find alter ego status.

The elements for finding an alter ego, which must be established by a preponderance of the evidence, are:

(1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction [a] fraud or promote injustice.

*LFC Mktg. Group, Inc. v. Loomis,* 116 Nev. 896, 904, 8 P.3d 841 (Nev.2000). Thus, whether the law of the state of incorporation of the Debtor or Revcon Nevada is used, the party seeking to impose alter ego must establish fraud or other injustice.

■ The Government's insistence upon federal common law seems to be based largely on its view that federal law does not require fraud for a finding of alter ego. Although the Government states that federal common law does not require a fraudulent intent to impose alter ego liability, the following cases cited by the Government *did* require a finding of fraud and/or injustice for imposition of alter ego: *NLRB v. Greater Kansas City Roofing,* 2 F.3d 1047, 1051 (10th Cir.1993) (The second element of the alter ego test is "would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations."); *Minnesota Laborers Health and Welfare Fund v. Scanlan,* 360 F.3d 925 (8th Cir.2004) (Applying the *Greater Kansas City Roofing* test to an ERISA case); *InterGen N.V. v. Grina,* 344 F.3d 134 (1st Cir.2003) (Alter ego analysis should focus on, among other factors, whether use of the corporate form would lead to inequality or substantial in-

justice.); and *Porta–John of America, Inc. v. United States,* 4 F.Supp.2d 688, 700 (E.D.Mich.1998) (Alter ego analysis addresses, among other factors, whether separate corporate forms were used to support illegality or fraud.).

In *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260 (D.Del.1989), plaintiff sued the parent company for patent infringement. The parent company was a Delaware holding company of an Oklahoma operating corporation that had a similar name. The defendant moved for summary judgment on the grounds that Mobil had sued the wrong party. Mobil countered that the parent company was liable for patent infringement on one of three grounds: (i) direct infringement, (ii) agency theory, and/or (ii) alter ego. The District Court determined that none of those theories was persuasive. In finding that the parent and subsidiary companies were not alter egos, the court first had to determine what body of substantive law to apply.

A potential issue in the alter ego analysis involves determining which body of substantive law should be applied. The possible sources of law are three-fold: (1) Oklahoma, the state of incorporation of the entity which would be disregarded; (2) Delaware, the state of incorporation of the parent corporation which would be held liable, and also the state in which this Court is situate; and (3) federal common law, this being a federal question case brought in federal district court.

*Id.* at 267. Citing numerous cases invoking federal common law and Delaware law, the District Court held that it would not "launch into a protracted choice of law analysis" because it was "convinced that regardless of which law is applied to the alter ego question—whether federal, Delaware or Oklahoma common law—the out-

come [would be] the same. Fraud or something like it is required." *Id.* at 268 (internal citations omitted). Like the *Mobil Oil* court, this Court finds that whether Delaware, Nevada or federal common law is used, fraud or some injustice is required to disregard separate corporate status to find alter ego.

## III. ARE DEBTOR AND REVCON NEVADA ALTER EGOS OF EACH OTHER?

■ Coast asks the Court to find that its claim against the Sale Proceeds constitutes the first and best claim against such proceeds, subject only to the administrative claims of the Trustee and superior to the claim of the Government. The Court will examine the issue of the validity and priority of Coast's lien based on Coast's argument that, applying the doctrine of alter ego, Debtor and Revcon Nevada should be treated as the same entity.

In ruling on cross motions for summary judgment, this Court ruled against Coast on its claim that it had the first and best lien on the Sale Proceeds based on the allegation that Revcon Nevada's transfer of the Campground to Debtor was fraudulent. The Court found that only the Revcon Trustee could avoid the alleged fraudulent transfer.[20] The Revcon Trustee did not file an adversary proceeding to avoid the transfer. Instead, the Revcon Trustee asserted and settled all of the Revcon Nevada bankruptcy estate's claims arising out of and/or relating to the transfer of the Campground by accepting $33,000.00 of the Sale Proceeds from Trustee. Coast filed its Judgment (against Revcon Nevada) after the Campground was transferred from Revcon Nevada to Debtor. Because Revcon Nevada did not own the real property at the time the Judgment was filed, the Judgment did not attach to the Campground. The Court did not previously address Coast's argument concerning alter ego as a basis for its assertion that the Judgment was the first and best lien because Coast did not argue this count in its motion for summary judgment.[21]

At the time Coast obtained the Judgment in the California Court on February 14, 2001, Revcon Nevada owned the Campground. Shortly thereafter, on March 28, 2001, Debtor was incorporated. Revcon Nevada transferred the Campground to Debtor on April 21, 2001. Marlies Novelli ("Marlies") testified that:

1. Debtor was created "to protect the membership" from the "Coast lawsuit." (Marlies Tr. at 73.)

2. The Campground was transferred to Debtor to keep Coast from foreclosing or trying to take over that Campground. (*Id.* at 74.)

3. Debtor did not give Revcon Nevada anything in exchange for the transfer of the Campground. (*Id.*)

Raymond Novelli's ("Raymond") testimony on these issues mirrored the testimony of his wife. He testified that:

---

**20.** Section 548(a)(1) of the Bankruptcy Code authorizes a trustee to avoid any transfer of an interest of the debtor in property that was made or incurred on or within two years before the date of the filing of the petition if the debtor (A) made the transfer with "actual intent to hinder, delay or defraud" any entity to which the debtor was or became, on or after the date that such transfer was made, indebted, or (B) received less than reasonably equivalent value in exchange for such transfer and was either insolvent at the time of the transfer or became insolvent as a result of such transfer. 11 U.S.C. § 548 (West 2008). Hence, the Revcon Trustee was the only entity authorized to seek to avoid the transfer of the Campground by Revcon Nevada to Debtor.

**21.** The Court further noted that even though a creditor can recover from the transferee—in this case, Debtor—based on fraudulent transfer, any such claim against Debtor would be an unsecured claim.

1. He directed that Debtor be incorporated. (Raymond Tr. at 74.)

2. Debtor was created and the Campground was transferred by Revcon Nevada to Debtor to "protect[ ] our members against any actions of Coast" because Coast was going to obtain a judgment against Revcon Nevada. (*Id.* at 75.)

3. Debtor did not pay Revcon Nevada any money or other consideration for the Campground. (*Id.* at 76.)

4. As a result of the transfer of the Campground to Debtor, no changes occurred in the members' rights at the Campground. Neither the members nor the employees of the Campground were informed of the transfer of ownership. (*Id.* at 76–77.)

Based upon the testimony of Marlies and Raymond, it is undisputed that the only reason Debtor was created and the Campground transferred from Revcon Nevada to Debtor was an attempt to hinder or delay Coast, as a creditor, in executing upon an asset of Revcon Nevada. Both Marlies and Raymond said that the purpose of the transfer was to "protect" the Campground's members from the Coast Judgment. Debtor paid no consideration to Revcon Nevada for the transfer. Thus, the elements for avoiding the transfer as fraudulent, as set forth in 11 U.S.C. § 548, appear to be satisfied. The Campground continued to operate without change after the transfer. Indeed, neither the members of the Campground nor the employees were informed about the change in ownership. Raymond testified that he did not believe that the checks for the Campground were changed, so the employees would not have noticed any change after or as a result of the transfer of the Campground. (Raymond Tr. at 77.)

The Court finds that there was a complete unity of interest between Debtor and Revcon Nevada and that the two entities were operated as if they were the same company. After transfer of the Campground to Debtor, Revcon Nevada had no other campground facilities to operate. Debtor and Revcon Nevada did not operate separately from each other. One or the other ran the Campground, but both did not operate independently at the same time.[22] The element of fraud or injustice is present here because the only reason Debtor was created and made transferee of the Campground was to keep Coast from executing against the Campground to satisfy its Judgment. No matter what law is applied—federal common law, Delaware state law, or Nevada state law—the Court finds that Debtor and Revcon Nevada are alter egos of each other.

### IV. COAST'S JUDGMENT LIEN

█ Having found that Debtor and Revcon Nevada are alter egos of each other, is Coast's Judgment Lien a valid lien against the Campground? And, if so, **when** did the Judgment Lien attach for purposes of determining priority of liens? Coast filed the Judgment Lien against Revcon Nevada on October 15, 2001. In its proof of claim, the Government asserts that is has a tax lien for taxes assessed in the name of Revcon Nevada in the amount of

**22.** Further evidence that Debtor and Revcon Nevada are alter egos is that both entities filed for bankruptcy protection on the same day. These two cases probably should have been substantively consolidated, but no one made a motion to do so. Coast sought consolidation in its Answer to the Adversary Proceeding, but this was not the proper procedure to effect consolidation. In addition, Coast never raised the issue in the Revcon Nevada bankruptcy, which is now closed.

$59,828.50,[23] which was filed on July 31, 2003. As a consequence, the Court must determine whether Coast's Judgment Lien or the Government tax lien against Revcon Nevada takes precedence for distribution of the Sales Proceeds.

The Government argues that, if this Court finds Debtor and Revcon Nevada are alter egos, Coast's lien is junior to the Revcon Nevada tax lien because: (i) Coast filed its Judgment Lien in Riverside County against Revcon Nevada, and (ii) Revcon Nevada has not held title to the Campground at any period since the Judgment Lien was filed. The Government cites to Cal.Code Civ. Proc. § 697.310 for the proposition that a judgment lien is created by recording an abstract of a money judgment with the county recorder and that such judgment attaches to all interests in real property in the county where the lien is created that are subject to enforcement of the money judgment against the judgment debtor. The Government argues that, because Revcon Nevada was not the title owner of the Campground at the time the Judgment Lien was recorded or any time thereafter, the Judgment Lien does not attach to the Campground.

The Government's second argument is that, even if the Judgment Lien does attach to the Campground, it does not have priority over the federal tax liens assessed against Revcon Nevada because the Judgment Lien is not choate. The Government argues that a judgment lien is not perfected until the identity of the lienor, the property subject to the lien, and the

amount of the lien are established.[24] Thus, the Government contends that the earliest date that Coast can be a judgment lien creditor with a perfected judgment lien against the Campground is the date this Court determines that Debtor and Revcon Nevada are alter egos. Such date, of necessity, would occur after the date the Government filed notice of its federal tax liens.

Coast provided no argument about when the Judgment Lien attached. Coast appears to assume that, if this Court finds Debtor and Revcon Nevada to be alter egos, the filing date of the Judgment Lien against Revcon Nevada controls and renders the Judgment Lien first in time with priority over the Government tax liens.

The priority of the Government and Coast's competing liens is determined primarily by the rule set down in *United States v. McDermott*, 507 U.S. 447, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993). In *McDermott*, the IRS assessed unpaid taxes against the debtors in 1986 but did not file the tax lien until September 9, 1987; meanwhile, on July 6, 1987, a creditor-bank filed a state court judgment it had won against the debtors. Both filings created liens against current and after acquired property of the debtors. On September 28, 1987, the debtors acquired title to real property in the county where both liens were filed. *McDermott*, 507 U.S. at 448, 113 S.Ct. 1526.

 The Supreme Court first noted the tax lien commenced "no sooner than

---

**23.** The proof of claim filed by the Government in the Revcon Nevada bankruptcy case (Case No. 04–44836) asserts this same amount. In its motion for summary judgment (Adv. Proc. Doc. # 55), the Government states that "the United States' lien claim as of the petition date based on unpaid assessments in the name of Revcon Nevada was $59,828." (Gov't Mot. for Summ. J. at 26, n. 10.)

**24.** The Government also cites to Treas. Reg. § 301.6323(h)–1(g), which provides that a judgment lien creditor is a person who has perfected a judgment lien on the property involved.

the filing of notice" while the "competing state lien [may be deemed] to be in existence for 'first in time' purposes only when it has been 'perfected' in the sense that 'the identity of the lienor, the property subject to the lien, and the amount of the lien are established.'" *Id.* at 449, 113 S.Ct. 1526. Both liens attached to the *McDermott* property simultaneously when the property was acquired. *Id.* at 453, 113 S.Ct. 1526. However, the Supreme Court further reasoned:

> [U]nder the language of [26 U.S.C.] § 6323(a) ("shall not be valid as against any ... judgment lien creditor until notice ... has been filed"), the filing of notice renders the federal tax lien extant for "first in time" priority purposes regardless of whether it has yet attached to identifiable property. That result is also indicated by the provision, two subsections later, which accords priority, even against *filed* federal tax liens, to security interests arising out of certain agreements, including "commercial transactions financing agreement[s]," entered into before filing of the tax lien. 26 U.S.C. § 6323(c)(1). That provision protects certain security interests that, like the after-acquired-property judgment lien here, will have been recorded before the filing of the tax lien, and will attach to the encumbered property after the filing of the tax lien, and simultaneously with the attachment of the tax lien (*i.e.,* upon the debtor's acquisition of the subject property). According *special* priority to certain state security interests in these circumstances obviously presumes that otherwise the federal tax lien would prevail—i.e., that the federal tax lien is ordinarily dated, for purposes of "first in time" priority against § 6323(a) competing interests, from the time of its filing, regardless of when it attaches to the subject property.

*Id.* at 453–454, 113 S.Ct. 1526 (underlined emphasis added; italics in original). In other words, even though the two liens attached at the same time, the federal lien had "first in time" priority and thus prevailed over the judgment lien.

Likewise, in the instant case, if Coast's Judgment Lien and the Government tax lien against Revcon Nevada attach simultaneously, upon this Court's determination that Debtor and Revcon Nevada are alter egos, the Government will prevail. Coast can only prevail if its Judgment Lien actually attached to the Campground prior to July 31, 2003, the date the Government filed notice of tax liens against both Debtor and Revcon Nevada. Nothing in the facts or case law supports attachment of Coast's Judgment Lien prior to July 31, 2003.

■■■■ "The Federal tax lien, though general, is a perfected choate lien when filed and cannot be defeated by a prior state lien unless the latter is also choate." *Juengel Constr. Co. v. Moenning,* 1978 WL 4602, *2, 1978 U.S. Dist. LEXIS 14877, *6 (E.D.Mo. Oct. 18, 1978). Generally, something is "choate" when it is "complete in and of itself ... [h]aving ripened or become perfected." BLACK'S LAW DICTIONARY (8th ed.2004). A lien becomes choate when it is " 'perfected in the sense that there is nothing more to be done to have a choate lien—when the identity of the lienor, the property subject to the lien, and the amount of the lien are established.'" *Horton Dairy, Inc. v. United States,* 986 F.2d 286, 291 (8th Cir. 1993) (quoting *United States v. New Britain,* 347 U.S. 81, 84, 74 S.Ct. 367, 98 L.Ed. 520 (1954)). *See also, In re Coppola,* 1994 WL 159525, 1994 U.S. Dist. LEXIS 565 (E.D.N.Y. Jan. 10, 1994) (applying the *McDermott* rule and finding for the United States).

In the instant case, Coast satisfies only two of the elements for establishing choateness: (i) Coast is identified as the lienor, and (ii) the amount of the lien is $3,880,038.52. The third element, however, is lacking because the property subject to the lien cannot be legally established until this Court enters an order determining an alter ego relationship between Debtor and Revcon Nevada. In this sense, the matter resembles the "after acquired property" facts of *McDermott.*

In addition to the three choateness requirements listed above, courts have also noted "that in order to be choate, the state [or] local lien must also be enforceable summarily without the necessity of a judicial proceeding." *Valley Bank of Nevada v. City of Henderson,* 528 F.Supp. 907, 914 (D.Nev.1981) (citing *United States v. Vermont,* 377 U.S. 351, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1964)). Coast's Judgment Lien fails to meet this choateness requirement as well. Coast's Judgment Lien is not enforceable without, at minimum, this Court's order. Consequently, Coast's Judgment Lien is not yet choate. There-fore, based on the reasoning in *McDermott,* the Government's tax lien against Revcon Nevada is deemed "first in time."

Similarly, in finding that the federal tax lien had priority over an improperly perfected security interest, the *Valley Bank* court reasoned, "Congress did not, however, extend priority to all persons asserting security interests under local law, but, rather, limited the class to those persons who had taken steps under local law to protect their interests." *Id.* at 911 (noting that the creditor "could easily have perfected its security interest in this case." *Id.* at 914, n. 9.). Like the *Valley Bank* creditor, Coast inexplicably failed to take timely legal action to perfect its claim. Coast could have brought a fraudulent conveyance action against Revcon Nevada in other contexts, but it did not do so.[25] Coast also could have filed a timely claim in the Revcon Nevada bankruptcy, but it failed to do that as well. This Court's finding of alter ego cannot and does not change the past.[26]

---

**25.** Prior to the bankruptcy filings by Debtor and Revcon Nevada, Coast could have filed a fraudulent conveyance action against either or both Debtor and Revcon Nevada utilizing California fraudulent conveyance law, pursuant to Cal. Civ.Code § 3439 *et seq.* If successful, the transfer would have been avoided, which would have meant that Coast's Judgment Lien would have been choate as of the date it was filed. Similarly, Coast could have asked the Revcon Trustee to bring a fraudulent conveyance action regarding the Campground. If the Revcon Trustee refused, Coast could have moved the Court for derivative standing to pursue the fraudulent conveyance action on behalf of the estate. Coast failed to take either such action.

**26.** Coast does not cite, nor did a thorough review reveal, any cases holding that a finding of alter ego is also cause to find that a judgment lien filed against one entity attached at the time of filing to property of that entity's alter ego. Only two cases address a similar issue, and they are distinguishable from the instant case. In *United States v. Winchell,* 790 F.Supp. 245 (D.Colo.1992), the court found a trust (the transferee) to be the alleged transferor's alter ego, and thus ruled that (i) the trust itself never actually existed, and (ii) the transfer was null and void. Such is not the case before this Court; there is no question that Debtor actually exists, and will continue to exist after entry of this order. The court in *Ceres Pipe and Metal, Inc. v. American Sec. Fin. Corp.,* 2007 WL 274218, 2007 Cal.App. Unpub. LEXIS 883 (Cal.Ct.App. Feb. 1, 2007) held that one of two competing creditors knew the corporation in question was the alter ego of its president, and thus a second creditor's lien against the president was enforceable upon the corporation's property. In addition to being factually distinguishable from the instant case, *Ceres Pipe* is an unpublished case, and thus, pursuant to California Rules of Court Rule 8.1115, this Court may not rely upon it.

As a consequence, this Court finds that the Government lien for taxes assessed against Revcon Nevada in the amount of $59,828.50 takes precedence and priority over Coast's Judgment Lien.[27]

## V. GOVERNMENT'S TAX LIENS

The Government filed notices of tax liens for taxes assessed in the names of Revcon California, Travel America, and All Seasons. The tax liens were filed against Revcon California on July 11, 1996; against Travel America on October 23, 2003; and against All Seasons on October 23, 2003, and November 6, 2003.[28] The Government takes the position that not only is Revcon Nevada the alter ego of Debtor, but that All Seasons, Travel America, and Revcon California are also alter egos of Debtor. As a result, the Government contends that the notices of tax liens for any or all of those entities attach to the Sale Proceeds.

■■■ The Government cites *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) for the proposition that a taxpayer's debts may be collected from the assets of his nominee, alter ego, or instrumentality. There does not appear to be any dispute about this legal principle. The issue is whether any or all of Travel America, All Seasons or Revcon California are alter egos of Debtor in order for there to be a basis for collection of those entities' tax assessments against Debtor.

■■■ This Court (i) permitted the Government to move for summary judgment on the issue of judicial estoppel and (ii) held that Coast would be *estopped* from arguing that Travel America and Revcon Nevada are *not* alter egos of each other. The Court noted specifically, however, that Coast's estoppel did not relieve the Government of its burden of proof to establish alter ego between these entities. (Memorandum Opinion Granting, in Part, and Denying, in Part, the United States' Motion for Summary Judgment Based on Estoppel at 10, 12 (Adv. Proc. # 156).)[29] Prior to trial, the Government's counsel expressed bewilderment about this ruling, essentially arguing that, since Coast could not oppose application of alter ego, the Government, of necessity, "won" on this argument. The Government misconstrues the procedural issue before the Court. The dispute between Coast and the Government is not the same as a traditional dispute between a plaintiff and a defendant, where one of the entities must prevail. Instead, in this case, Coast and the Government assert competing interests in the same pool of money—*i.e.*, the Sale Proceeds. The outcome of this dispute has three possibilities: (i) both Coast and the Government have valid liens (in which case the priority would have to be determined), (ii) only one of the defendants has a valid lien, or (iii) neither Coast nor the Government have valid liens. The Government asserts the validity of its tax liens on the basis that Debtor is liable because it is the alter ego of the entities against which unpaid taxes were assessed—*i.e.*,

27. Although this Court's finding of alter ego between Debtor and Revcon Nevada establishes that Coast has a valid claim against Debtor, that claim remains unsecured. Pursuant to 11 U.S.C. § 362(a)(4), the automatic stay prevents Coast from "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362 (West 2008).

28. See Government proof of claim no. 2.

29. In addition to entry of this Court's Memorandum Opinion and Order (Adv. Proc. Doc. ## 156, 157), the Court orally relayed this same information to the Government (i) during a pre-trial telephone status conference and (ii) at trial (Trans. 31:19–32:5).

one or more of Travel America, All Seasons, and/or Revcon California. The Government bears the burden of proof on the issue of alter ego, whether or not Coast is estopped from presenting counter evidence or argument.[30] Because the Court has already found that Debtor and Revcon Nevada are alter egos of each other, if the Government proves, by the preponderance of evidence, that Revcon Nevada is the alter ego of one or more of Revcon California, All Seasons and/or Travel America,[31] then it will also establish that Debtor is the alter ego of such entity or entities.[32]

## A. *Revcon California as Alter Ego of Revcon Nevada*

 There does not appear to be any reason for the Government to assert that Revcon California and Revcon Nevada are alter egos of each other except for the similarity in their names. It is undisputed that Revcon California was formed when the assets to manufacture motor coaches were acquired in the late 1980's. (Raymond Tr. at 32–34.) The California manufacturing company was originally called Off Road Motorcoach because the Revcon Motorcoach name was not then available in California, although the corporation from which the assets were purchased was formerly known as Revcon Motorcoach. (*Id.* at 33, 35.) Mr. Novelli tried to preserve the Revcon name by incorporating a company with a similar name in Nevada, which originally was a dormant corporation. (*Id.*)

Revcon California "was pretty much stand alone because it was a manufacturer and not a campground company. So they had a staff and a different building that they operated out of in California." (*Id.* at 35.) Mr. Novelli testified that Revcon California became "intermingled" with the "All Seasons Group" in approximately 1994 or 1995 when the "operation was lacking funds to operate independently"; at that time, Mr. Novelli put the Revcon California accounting and other functions on the central computer system. (*Id.* at 35–36.) At that same time, the headquarters of Revcon California was moved from its separate location to the business location of the campgrounds. (*Id.* at 36–37.) Revcon California did not pay rent after the move, and it saved money by utilizing the common computer system and office employees for accounting functions. (*Id.* at 37, 39.)

There was no testimony by either Raymond or Marlies Novelli concerning: (i) the officers or directors of Revcon California; (ii) who controlled Revcon California; or (iii) any connection between Revcon California and Revcon Nevada. Although Revcon Nevada may have been formed to preserve the Revcon name, there is no evidence at all that Revcon California and Revcon Nevada lacked separate existence. The most that the testimony shows is that, in the mid 1990's, Revcon California moved its offices to the headquarters of All Seasons (where Revcon Nevada also had its headquarters) and used the same computer system for billing and accounting functions that Revcon Nevada used during this period of time. Those facts, alone, are hardly sufficient to find that Revcon California and Revcon Nevada were alter egos. The record is also devoid of when Revcon

---

**30.** In point of fact, Coast and the Government submitted the same deposition testimony in support of each of their cases. Accordingly, it is only argument on this issue for which Coast was estopped.

**31.** The Government focused much of its attention on evidence that Travel America and All Seasons are alter egos of each other, but this question is not before the Court.

**32.** See note 9, *supra.*

California ceased manufacturing operations, so it is unclear how long there was an overlap in headquarters' location and use of the same computer system for accounting functions. After the demise of Revcon California's manufacturing business, Revcon Nevada continued to operate the Campground. These two entities had separate corporate existence. The Government has failed to establish any of the elements necessary to carry its burden of proof regarding Revcon California as an alter ego of Revcon Nevada. As a consequence, the tax lien of Revcon California in the amount of $269,527.79 is not a valid lien against the Sale Proceeds.

### B. Travel America as Alter Ego of Revcon Nevada

■ The Government has assessed tax liens against Travel America in the total amount of $1,460,163.07, which the Government asserts is a lien against the Sale Proceeds on the basis that Travel America is the alter ego of Revcon Nevada.

The following facts are undisputed regarding Travel America's relationship to the Campground and/or Revcon Nevada. Travel America was formed, in 1997, when Mr. Novelli merged the approximately 50 All Seasons campgrounds with approximately 20 or 30 "independent" campgrounds owned by Thousand Adventures. (Raymond Tr. at 59–60, 63.) Mr. Novelli's intent was to take all of the campgrounds and provide reciprocal camping rights to all members. (Id. at 61.) "We were going to take all of the campgrounds and make them reciprocal through Travel America. That all of the campgrounds of Thousand Adventures, as they were able to join the organization, would be put in there. And all of the organizations of the All Seasons/First Nationwide group would also be merged into that Travel America on a reciprocal system." (Id.)

The original officers and directors of Travel America were Raymond Novelli, David Vopnford and Tom Cloud, but later Mr. Vopnford and Mr. Cloud resigned. (Id. at 64.) During the first six months of existence for Travel America, Messrs. Novelli, Vopnford and Cloud made joint decisions concerning operations of Travel America. (Id.) The business location for Travel America was the same location as All Seasons' prior headquarters. (Id. at 65.) No changes occurred at the Campground as a result of the formation of Travel America. (Id. at 68.)[33]

Mr. Novelli was the person with ultimate authority over the Campground. (Id. at 89.) The funds of Debtor were comingled with the fund of the "other companies" in a sweep account. (Id.) A central computer system tracked the cash flow into and out of each campground's account. (Id. at 114–15.) The promissory note to Miles Shook for which Revcon Nevada was liable for the purchase of the Campground was paid out of the sweep account. (Id. at 90.)

The Government's argument for a finding of alter ego between Travel America and Revcon Nevada boils down to the following elements:

1. Mr. Novelli controlled the decision-making for (i) Travel America and (ii) Revcon Nevada;

2. Corporate formalities were sometimes ignored by some of the Novelli Group entities;[34]

33. See n. 31, supra.

34. The admitted exhibits demonstrate, however, that, at times, the Novelli Group entities followed corporate formalities, specifically (i) Travel America and Revcon Nevada each had a Board of Directors; (ii) the Revcon Nevada Directors each consented in writing to purchase of the Campground; and (iii) the Rev-

3. All monies from the various campground operations were combined each night into a sweep account from which the expenses of all campgrounds were paid;

4. Travel America and Revcon Nevada (as well as the other companies operating campgrounds) had the same business address;

5. Travel America and Revcon Nevada (as well as the other companies operating campgrounds) utilized the same central computer and computer systems for accounting and billing;

6. Travel America and Revcon Nevada (as well as the other companies operating campgrounds) were serviced by the same employees for accounting, billing, and bill paying functions; and

7. The campgrounds shared various items of equipment without charge for such use.

What is notably absent from this list of elements is any fraud or something that looks like fraud. The Government cites to no element of injustice that occurred due to the use of the sweep account, common control by Raymond Novelli, the shared accounting personnel, the central computer for accounting and billing functions and/or the common business address. Corporations may employ sweep accounts, centralized planning, a common address, and/or shared accounting systems for legitimate business purposes. The sweep account is a good case in point. It was utilized because "[d]ifferent campgrounds had different funds at different times of the year.... Campgrounds like Two Springs couldn't survive in the summer.... They had more income naturally during the winter. So sometimes you'd have a plus situation and sometimes a minus situation on

con Nevada Board met September 16, 2004,

funds." (Raymond Tr. at 27–28.) Even though the funds were "swept" into one account, the Novelli Group entities kept separate accounting records.

Q: ... [T]here was [sic] always records maintained, was there not, as to what bills were paid on behalf of which corporation and what monies were received on behalf of what corporation?

A: In the computer. It would be entered. The cash flow coming in and the cash flow going out.

Q: So you always knew what balance was due or a plus and minus balance from the receipts and disbursements from the individual corporations?

A: Correct.

Q: ... [R]ecordkeeping in the sweep account enabled you to determine to the penny how much the individual corporations earned or lost every year; is that correct?

A: Yes

(*Id.* at 114–115.)

At trial, counsel for the Government asserted that the "smoking gun" was Mr. Novelli's deposition testimony that the Novelli Group entities were separately incorporated "to keep the liability in certain areas." (Trial Tr. 107:10–19.) However, there is nothing inherently fraudulent about using different corporate structures to limit liability.

Q: ... Why did you operate with fifteen different corporations owning 20 different properties?

A: One of reasons was bankruptcy requirements—and we were in bankruptcy since I got into the campground business....

Q: So, that's why you established and maintained separate corporations?

to decide to file the Revcon Case.

A: Well, also to keep the liability in certain areas. In other words, we just seemed to have better control by separate corporations.

(Raymond Tr. at 118.)

The only "injustice" that the Government can point to is the inability of the Government to collect taxes that have been properly assessed against Travel America. Inability to collect a debt from the original debtor is not sufficient reason to pierce a corporate veil and/or find that two corporations are alter egos of each other. As set forth above, the court in *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260 (D.Del.1989), found that fraud or something like fraud was required for a finding of alter ego. The *Mobil Oil* court determined that no fraud or injustice existed in that case to impose alter ego.

> The injustice/inequity alleged by Mobil, however, is insufficient to justify disregarding the separate corporate existence of the Oklahoma subsidiary. Any breach of contract and any tort—such as patent infringement—is, in some sense, an injustice. Obviously this type of "injustice" is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud. The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless and would sanction bootstrapping.

*Id.* at 268.

The Government treated Travel America and Revcon Nevada as separate taxable entities by assessing taxes and obtaining separate and distinct liens against each business. The Government made assessments against Travel America on various dates from March 16, 1998, through April 30, 2001, and against Revcon Nevada from March 8, 1999, to May 21, 2001. These actions by the Government contradict the Government's current position that Travel America and Revcon Nevada are but one and the same entity. *Accord, Old W. Annuity & Life Ins. Co.*, 2008 WL 2993958 at \*8, 2008 U.S. Dist. LEXIS 59112 at \*32 ("Moreover, there is ample evidence that All Seasons engaged in sufficient 'business activity' to be considered a separate taxable entity.... Indeed, the United States itself treated both Apollo and All Seasons as separate taxable entities; the IRS has assessed taxes and obtained separate and distinct liens against both businesses.").

Finding that there is no fraud, something like fraud, or any injustice as a result of the facts cited by the Government concerning the operations of Travel America and Revcon Nevada, this Court determines that application of alter ego regarding these two entities is not warranted. As a consequence, the federal tax lien against Travel America is not a valid lien against the Sale Proceeds.

## C. All Seasons Resorts as Alter Ego of Revcon Nevada

■ The Government's questioning of Mr. Novelli shows that the Government believes that All Seasons and Travel America are alter egos of each other. That issue is not before the Court, which need only determine whether All Seasons is the alter ego of Revcon Nevada for purposes of the All Seasons federal tax lien attaching to the Sale Proceeds.[35] The facts concerning All Seasons and Revcon Nevada are virtually the same as those between Travel America and Revcon Ne-

**35.** Because the Court has found that Travel America and Revcon Nevada are not alter egos, a finding that All Seasons and Travel America are alter egos would not help the Government's position.

vada.[36] The Government presented no evidence of any fraud or anything like fraud in connection with All Seasons and Revcon Nevada. As a consequence, the analysis set forth above, in which the Court found that imposition of alter ego was not appropriate, is equally applicable here. Consequently, the federal tax lien for taxes assessed against All Seasons is not a valid lien against the Sale Proceeds.

## VI. CONCLUSION

For the reasons given above, the Court finds that (i) Debtor and Revcon Nevada are alter egos of each other; (ii) neither Debtor nor Revcon Nevada are the alter egos of All Seasons, Travel America, or Revcon California; (iii) the Government's tax assessment of $59,828.50 against Revcon Nevada is a valid secured claim against Debtor; (iv) the Government's tax assessments against All Seasons, Travel America, and Revcon California are not valid claims against Debtor; and (v) Coast's $3,880,038.54 claim, based on the Judgment Lien against Revcon Nevada, is an unsecured claim against Debtor.[37]

An appropriate Order will follow.

## ORDER REGARDING TRIAL

For the reasons set forth in this Court's Memorandum Opinion entered on this date, the Court hereby finds that Revcon Motorcoach Inc., a Nevada corporation ("Revcon Nevada") and Debtor Two Springs Membership Club ("Debtor") are alter egos of each other, but neither Debtor nor Revcon Nevada are the alter ego of any of the following: (i) All Seasons Resorts, Inc. ("All Seasons"), (ii) Travel America, Inc. ("Travel America"), and/or (iii) Revcon Motorcoach, Inc., a California Corporation ("Revcon California").

The Court further finds that (i) the federal tax assessment of $59,828.50 against Revcon Nevada, filed by the United States of America on behalf of the Internal Revenue Service ("Government") is a valid secured claim against Debtor; (ii) the Government's tax assessments against All Seasons, Travel America, and Revcon California are not valid claims against Debtor; and (iii) the $3,880,038.54 claim of Camp Coast to Coast, Inc. and Affinity Group, Inc., based on the Judgment Lien against Revcon Nevada, is an unsecured claim against Debtor.

The Court hereby directs chapter 7 trustee Elaine Greaves to disburse, in accordance with this Order, the sales proceeds remaining from sale of Debtor's property located at 14200 Indian Avenue, North Palm Springs, California.

---

**36.** Only the dates differ significantly. The Government made assessments against All Seasons on various dates from May 4, 1987, through December 9, 1996.

**37.** Coast's claim was filed as an unsecured claim after the bar date. Trustee may object to its allowance.